Argued March 21; affirmed April 18; rehearing denied May 23, 1939

# WELCH HOLDING COMPANY *v.* GALLO-WAY ET AL.

## (89 P. (2d) 559)

In Banc.

*Ralph R. Bailey*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for appellants.

*Carl E. Davidson*, of Portland (Ivan F. Phipps and Charles E. McCulloch, both of Portland, on the brief), for respondent.

BEAN, J. This is an appeal from a decree of the circuit court for Multnomah county, setting aside an order of the State Tax Commission rejecting the plaintiff's claims for refund of corporation excise taxes paid

for the years 1929 and 1930. The necessary statutory steps were taken to bring the question before this court.

During July, 1930, the plaintiff filed an excise return for 1929, accompanied by an affidavit stating that the corporation owed no excise tax for that year. On or about April 1, 1931, the plaintiff filed an excise return for 1930, which also indicated that the corporation owed no excise tax for that year. Throughout the years 1930 and 1931, a series of conferences was held between representatives of the taxpayer and the State Tax Commission in reference to the question of plaintiff's tax liability for the years 1929 and 1930. As a result thereof the plaintiff, under protest, paid excise taxes to the State of Oregon and claims for refund of these taxes were filed on May 7, 1932. Subsequently a formal hearing was held before the State Tax Commission, which resulted in a denial of the plaintiff's claims for refund, on January 22, 1934. An appeal for review of the commission's determination was taken to the circuit court for Multnomah county on March 22, 1934. By stipulation between counsel for the parties, the time for filing defendants' answer was extended to May 18, 1937, on which date the plaintiff served notice on the defendants requesting that an appearance be made on or before June 10, 1937. The defendants' original answer was filed on August 2, 1937, and an amended answer was filed thereafter. The cause was set for trial on June 29, 1938. A decree was entered in the trial court in favor of the plaintiff on September 20, 1938, and thereafter the defendants perfected an appeal to this court.

Ernest M. Welch has for many years been engaged in the retail mortuary business and also in the business of cremation and vault entombment. Each unit

of such business has been operated as a separate corporation with 75 or 80 per cent of the capital stock owned by Ernest M. Welch and his associates, the balance of the stock of each corporation being owned by employees or the manager of the corporation. Prior to March 24, 1926, all of that part of the capital stock of these corporations, which was owned by Ernest M. Welch and his associates, was held in the name of Ernest M. Welch. He was the active manager of these various enterprises. His management was highly successful and he was given a free hand, any funds required being supplied by his associates without question.

■ Upon receipt of dividends from the operating companies, Mr. Welch would immediately distribute them proportionately among his associates and himself in accordance with their interests in the capital stock of the operating companies. Mr. Welch's position with regard to the stock of the operating companies was that of trustee, in fact as well as in name. There was, however, no writing evidencing this trust nor any express oral agreement of trust. The trusteeship of Ernest M. Welch was one which the law implies from his having the property of his associates, in the form of corporate stock in the operating companies, in his own name.

Shortly before March 24, 1926, the United States Treasury Department, Bureau of Internal Revenue, proposed to assess against Ernest M. Welch personally, income taxes for the years 1920 to 1923, inclusive, based upon the entire amount of dividends received by him from the operating companies. The amount of the proposed assessment was in excess of $40,000 of income taxes, plus fraud penalties of more than $20,000.

Mr. Welch was not legally liable for these taxes and

penalties, as the dividends received by him from the operating companies had been distributed to the beneficial owners of the stock. However, the proof of his trusteeship was not in such form as to be acceptable to the federal taxing authorities, and it was only after a long series of conferences in Washington, D. C., and the incurring of considerable expense, that the Bureau of Internal Revenue accepted Mr. Welch's proof of the ownership of the various shares by his associates and himself.

Upon the assertion of these large additional federal income taxes and penalties, Mr. Welch consulted his attorney, who advised the recording of the beneficial ownerships of the stock of the operating companies by means of a corporation. Pursuant to that advice, Welch Holding Company, the plaintiff herein, was formed on March 24, 1926. The authorized capital stock of the Welch Holding Company was 1,000 shares of par value of $100 per share. Ernest M. Welch subscribed for 750 of these shares, as trustee, and 125 shares for himself. Edith M. Welch, his wife, subscribed for 124 shares, and E. V. Littlefield, Mr. Welch's attorney, subscribed for one share. Payment of these subscriptions was made by the transfer by Ernest M. Welch of all the stock which he held as trustee for himself and his associates, in Portland Cremation Association, a corporation engaged in the cremation and vault entombment business at Portland, Oregon, Bonney-Watson Company, a corporation engaged in the retail mortuary business at Seattle, Washington, and Shaw-Huston Company, a corporation engaged in the retail mortuary business at Yakima, Washington. The stock so transferred by Ernest M. Welch was all of the stock owned by Mr. Welch and his associates in these cor-

porations, and was either 75 or 80 per cent of the stock of each corporation, the balance being owned by persons other than Mr. Welch and his associates. The stock of the Welch Holding Company was issued as follows:

C. R. Welch (father of Ernest M. Welch) ____ 125 shares
Flora A. Welch (mother of Ernest M.
  Welch) _____ 125 shares
W. M. Welch (uncle of Ernest M. Welch) _____ 250 shares
Edith M. Welch (wife of Ernest M. Welch)__ 124 shares
E. V. Littlefield (attorney, qualifying share)    1 share
H. S. Tuthill _____ 125 shares
Gertrude Tuthill _____ 125 shares
Ernest M. Welch _____ 125 shares

Promptly upon issue, these shares were indorsed and redelivered to Ernest M. Welch by the persons in whose names they were issued, and Ernest M. Welch has held them since that time. There were no transfers, even following the death of some of the persons in whose names the stock was issued.

After the formation of the Welch Holding Company, dividend checks of the operating companies were made payable to Welch Holding Company and deposited in a checking account in its name. Ernest M. Welch deposited the checks and thereupon promptly wrote checks to himself and his associates, in proportion to their beneficial interests in the operating companies, and delivered the checks. Only a minimum balance was maintained in the checking account of Welch Holding Company.

The manner in which Ernest M. Welch managed the operating companies and distributed the funds received from them as dividends was the same after the formation of Welch Holding Company as before, except that the receipt and disbursement was in the

name of Welch Holding Company instead of Ernest M. Welch.

Welch Holding Company has never had an office. In reports to the corporation department, Mr. Littlefield's office in the Yeon building was designated as the company's statutory office. It has never had any letterheads or other stationery bearing its name. Welch Holding Company has never declared any dividends or had capital invested in this state. It did not employ or manage any property. Ernest M. Welch has at all times been president of Welch Holding Company and has never received any salary as such. He was an officer of Portland Cremation Association, Bonney-Watson Company and Shaw-Huston Company, but received a salary only from Portland Cremation Association. Welch Holding Company has never had an officer or employee to whom any salary, wages or other compensation was paid. It has never had any books of account, other than a small memorandum book in which Ernest M. Welch recorded the dividends received from the operating companies and a check register in which he recorded the disbursement of these receipts.

Portland Cremation Association has, at all times since the enactment of the Oregon corporation excise tax law, paid corporation excise taxes to the State of Oregon upon or measured by its net income, including such taxes for the years 1929 and 1930.

In the year 1928, the stock of Shaw-Huston Company, which was issued in the name of Welch Holding Company, was exchanged for a controlling stock interest in Clough-Huston Company, which company was engaged in the retail mortuary business at Salem, Oregon. This exchange was said to be an accommodation to Mr. Welch's brother-in-law.

In the year 1929 the stock of Clough-Huston Company was sold for $30,750, and the amount was loaned, without interest, to Welch Holding Company of California, in which latter company the same associates, plus others, were interested. This sum was repaid later and was distributed by Ernest M. Welch to himself and his associates in the proportion represented by their beneficial interests in the Clough-Huston Company. At no time did Welch Holding Company acquire or dispose of any other assets except that early in the year 1931 all of the assets were conveyed to a Delaware corporation. Clough-Huston Company paid to the State of Oregon an excise tax upon or measured by its net income for the year 1929. Bonney-Watson Company paid to the State of Washington for the years 1929 and 1930 all the taxes imposed upon that corporation by the State of Washington. Ernest M. Welch, Edith M. Welch, H. S. Tuthill and Gertrude Tuthill were residents of the State of Oregon during the years 1929 and 1930. For the year 1930, the first year for which the Oregon intangibles income tax was in effect, each of these persons paid intangibles income taxes on all income distributed to them through the Welch Holding Company.

The State Tax Commission of the state of Oregon, some time prior to December 31, 1930, demanded that Welch Holding Company pay to the State of Oregon corporation excise taxes in the amount of $3,348.32 for the year 1929, plus a penalty of 5 per cent and interest at the rate of 12 per cent per annum, the total amount demanded being $3,817.09. On May 19, 1931, the State Tax Commission made a revised demand of corporation excise taxes for the same year in the amount of $1,650, plus a penalty of 5 per cent and in-

terest at the rate of 12 per cent per annum, making the total demanded $1,973.50.

On January 2, 1932, Welch Holding Company paid to the State Tax Commission corporation excise taxes for the year 1930, including penalty and interest at the full statutory rate of 12 per cent, the total payment being $1,527.20. On January 6, 1932, Welch Holding Company paid to the State Tax Commission corporation excise taxes for the year 1929, including 5 per cent penalty and interest at the full statutory rate of 12 per cent, the total payment being $1,914.

Defendants have relied upon two distinct theories to defeat plaintiff's claim for refund, namely, first that the corporation excise taxes for the years 1929 and 1930, of which refund is sought, were properly collected; and, second, intangibles income taxes were due for the year 1930 in excess of corporation excise taxes paid for 1929 and 1930, so that even if no corporation excise taxes were due, such intangibles taxes may be used as a recoupment to defeat the claim for refund.

Plaintiff submits that it was not "doing business" during the years 1929 and 1930, and was therefore not subject to the Oregon corporation excise tax for those years.

The statutory provisions of the Oregon corporation excise tax law which appeared to be pertinent to the controversy were the same for 1929 and 1930, and are as follows:

"Every bank, other than a national banking association, and every financial corporation, building and loan association, savings and loan association and mutual savings bank, located within the limits of this state, shall annually pay to the state, for the privilege of carrying on or doing of business by it within this state, an excise tax according to or measured by its net

income, to be computed in the manner hereinafter provided, at the rate of 5 per cent upon the basis of its net income for the next preceding fiscal or calendar year.'' § 69-1304, Oregon Code 1930.

''Every mercantile, manufacturing and business corporation doing business within this state, except as hereinafter provided, shall annually pay to this state, for the privilege of carrying on or doing of business by it within this state, an excise tax according to or measured by its net income, to be computed in the manner hereinafter provided, at the rate of 5 per cent upon the basis of its net income for the next preceding fiscal or calendar year.   *   *   *.''  § 69-1306, Oregon Code 1930.

''(f) The term 'doing business', as herein used, means any transaction or transactions in the course of its business by a national banking association, by a corporation created under the laws of this state, or by a foreign corporation qualified to do or doing business in this state.''  § 69-1302, Oregon Code 1930.

■ The essential elements which must be found in order to subject the plaintiff to taxation under the Oregon corporation excise tax law for the years 1929 and 1930 are, first, that the respondent was ''doing business'' in those years, and, second, that the plaintiff had income during those years.

■ The transaction or transactions mentioned in the last sections must be ''in the course of'' the business of the corporation. We understand that this section, that requires a ''transaction or transactions in the course of its business'' by a corporation created under the laws of this state, means that any incidental or casual transaction not in the course of business of the corporation would not be ''doing business''.

Whether the respondent is to be classified as a ''financial corporation'' section 69-1304, Oregon Code

1930, or as a "business corporation", under section 69-1306, Oregon Code 1930, the test of taxability is the same, namely, whether the corporation was "doing business" within the meaning of the statute.

■ A corporation which does not carry on activities for gain is not "doing business" within the meaning of the Oregon corporation excise tax law: *Zonne v. Minneapolis Syndicate,* 220 U. S. 187, 55 L. Ed. 428, 31 S. Ct. 361; *McCoach v. Minehill & S. H. R. Co.,* 228 U. S. 295, 57 L. Ed. 842, 33 S. Ct. 419; *United States v. Emery, Bird, Thayer Realty Co.,* 237 U. S. 28, 59 L. Ed. 825, 35 S. Ct. 499; *United States v. Nipissing Mines Co.,* 206 F. 431; *Butterick Co. v. United States,* 240 F. 539.

■ The holding of securities of other corporations and the distribution of dividends paid thereon do not constitute "doing business" within the meaning of the Oregon corporation excise tax law: *Automatic Fire Alarm Co. of Delaware v. Bowers,* 51 F. (2d) 118; *Rose v. Nunnally Inv. Co.,* 22 F. (2d) 102 (Cert. denied 276 U. S. 628); *Eaton v. Phoenix Securities Co.,* 22 F. (2d) 497; *United States v. Three Forks Coal Co.,* 13 F. (2d) 631; *Cannon v. Elk Creek Lbr. Co.,* 8 F. (2d) 996.

As noted, by the terms of the statutory definition, a transaction or transactions, whether by a domestic or foreign corporation, must be "in the course of its business". If no business is done, a transaction cannot be in the course of business. The definition was plainly not incorporated into the statute to aid in distinguishing between corporations which are "doing business" and those which are not "doing business". The definition relates to the question of what parts of a business are within and without the state by providing that this question shall be determined by the situs of the transactions of the corporation.

Article 5 of the excise tax law regulations, issued by the defendants on January 6, 1930, provides: "Doing business in this state means the carrying on or transacting of business in the ordinary and natural acceptation of those terms    *    *    *."

■ The words "doing business" have been used for years in laws imposing taxes upon corporations for the privilege of doing business. In the absence of a clearly expressed intention to do so the Oregon legislature will not be held to have meant by its use of this common expression something different from the usual meaning of the words. It seems that in their ordinary sense the words "doing business" mean the engaging in activities in the pursuit of gain. Defendants apparently agree with this definition. Tested by this definition, the Welch Holding Company was not "doing business" in 1929 and 1930.

There was no intention that the Welch Holding Company should ever engage in any activity or that it should make any profit. The sole purpose of formation was to make and preserve a record of the beneficial ownership of stock in operating companies to avoid the assertion of federal income taxes upon Ernest M. Welch because of the receipt of dividends from stock held by him as trustee. Welch Holding Company did not enter into any transaction for profit during the years 1929 or 1930. In the year 1929 the stock of Clough-Huston Company was liquidated and the proceeds applied for the benefit of the stockholders by a loan without interest on their behalf, followed by a distribution of the proceeds of the liquidation when the loan was repaid.

The profits and dividends of the subsidiary companies in the state of Washington, after the funds reached the state line of the state of Oregon, were not

increased and no profits were added thereto by the Welch Holding Company, or anyone else. The Welch Holding Company had no more interest in the dividends of the subsidiary companies than an express company would have in transmitting the same from the state of Washington to the beneficiaries.

In 1 Words and Phrases, (4th Series) p. 780, we read:

"Corporation organized to hold realty for disposal and liquidation is not 'doing business' within income tax law, though incidentally collecting and distributing rents. Blair v. Wilson Syndicate Trust (C.C.A.) 39 F. (2d) 43, 45."

So, too, a corporation organized to hold shares of stock, and to receive and distribute shares of stock and dividends of other corporations, although owning the shares of stock in the holding company, is not doing business within the income tax law of the state of Oregon.

Again, we read in 1 Words and Phrases, (4th Series) p. 780, as follows:

"When corporation is organized for definite purpose, the ultimate object of which is profit, and it engages in business of effectuating that purpose, and then stops business by reason of sale, lease, or other action, and thereafter merely receives and distributes avails of its reorganized affairs, it is not 'doing business,' within meaning of Revenue Act 1918, § 1000, 40 Stat. 1057, 1126, and Revenue Act 1920, § 100, 42 Stat. 227, 294, imposing excise tax with respect to carrying on or doing business. Harmar Coal Co. v. Heiner (C.C.A. Pa.) 34 F. (2d) 725, 728."

■ By a parity of reasoning, a corporation organized for a definite purpose, where its ultimate object is not profit and it never commences or engages in business

but merely receives and distributes avails of subsidiary corporations, is not "doing business".

A number of cases which are entitled to great respect in determining what constitutes "doing business", under the Oregon corporation excise tax law, were decided under the Federal excise tax law of 1909. This statute, 36 Stat. at L. p. 11, C. 6, imposed a tax based upon net income "with respect to carrying on or doing business by such corporation."

In the case of *Zonne v. Minneapolis Syndicate,* supra, the court held that a corporation which was engaged in the sole activity of holding title to land, receiving and distributing the rentals and the proceeds from any disposition to its stockholders, was not "doing business". In *McCoach v. Minehill & S. H. R. Co.,* supra, the court held that a railroad corporation which had leased its railroad and was engaged in collecting rentals, receiving interest on investments, paying organization expenses and making distribution to stockholders, was not "doing business" under the Federal excise tax law of 1909. In explaining its decision in the Zonne case and that of *Flint v. Stone-Tracy Co.,* 220 U. S. 107, 55 L. Ed. 389, 31 S. Ct. 342, Ann. Cas. 1912 B, 1312, the court said:

"The distinction is between (a) the receipt of income from outside property or investments by a company that is otherwise engaged in business; in which event the investment income may be added to the business income in order to arrive at the measure of the tax; and (b) the receipt of income from property or investments by a company that is not engaged in business except the business of owning the property, maintaining the investments, collecting the income, and dividing it among its stockholders. In the former case the tax is payable; in the latter not."

In *United States v. Emery, Bird, Thayer Realty Co.*, supra, the court held that a corporation engaged in the holding of real property and leasing it to a single lessee was not "doing business". The court said:

"The question is rather what the corporation is doing than what it could do (228 U. S. 305, 306), but looking even to its powers they are limited very nearly to the necessary incidents of holding a specific tract of land. The possible sale of the whole would be merely the winding up of the corporation. That of a part would signify that the Dry Goods Company did not need it. The claimants' characteristic charter function, and the only one that it was carrying on, was the bare receipt and distribution to its stockholders of rent from a specified parcel of land. Unless its bare existence as an intermediary was doing business, it is hard to imagine how it could be less engaged."

In the case of *United States v. Nipissing Mines Co.*, supra, the court held that a corporation which was organized to own the stock of a mining company and had no assets except such stock, a small amount in the bank and office furniture, etc., and did nothing other than receive dividends from the operating company and distribute them as such, was not "doing business" within the Federal corporation excise tax law of 1909. In *Butterick Co. v. United States,* supra, the court held that a corporation engaged in the holding of stock of subsidiaries and activities incidental thereto was not "doing business" within the Federal corporation excise tax law of 1909. The court said:

"The plaintiffs here paid the taxes for the months of January and February under protest and seek to recover them in these actions. The government contends that the direction of the management of the subsidiary companies by the holding companies was a doing of business which subjected the holding companies to an

excise tax. This direction was accomplished only by the control of the subsidiary companies through stock ownership. Of course, proxies had to be issued to vote at the meetings of the operating companies, and the directors of the latter were chosen by the owners of the stock. No holding company can exist without a corporate activity involved in the exercise of such control through its stock ownership in the operating company, but such corporate activity is not, under the authority of United States v. Nipissing Mines Co., 206 Fed. 431, the exercise of a franchise which is subject to an excise tax.''

In *North Jersey Title Ins. Co. v. Commissioner*, 84 F. (2d) 898, a case similar to the one in hand, which was quoted from in *Ehrman v. Galloway*, decided by this court January 17, 1939, 160 Or. 418, 86 P. (2d) 445, the court said:

''The principle that substance and not form should control in the application of income tax law is fundamental. Fictional corporate camouflage can not be made the device to escape taxation. On the other hand, equal equity demands that the creation of a subsidiary corporate structure with no purpose of evading tax but solely for the purpose of meeting the exigencies of a serious and possible fatal financial situation should not be regarded as the birth of a new entity completely unidentified with the former for taxing purposes, particularly under the peculiar circumstances surrounding the instant case.''

In *Von Baumbach v. Sargent Land Co.*, 242 U. S. 503, 61 L. Ed. 460, 37 S. Ct. 201, 204, we read:

''As the tax was there held to be assessed upon the privilege of doing business in a corporate capacity, it became necessary to inquire what it was to do business, and this court adopted with approval the definition, judicially approved in other cases, which included within the comprehensive term 'business' 'that which occu-

pies the time, attention, and labor of men for the purpose of a livelihood or profit'. ''

In *Harmar Coal Co. v. Heiner,* 34 F. (2d) 725, 728, we read:

''In the Sargent Land Company case the court, recognizing that a decision whether a corporation is carrying on business within the meaning of the Corporation Tax Law must depend in each instance upon the particular facts before the court and recognizing also that not everything that is done constitutes doing business but rather that it is the purpose for which a thing is done that places the corporation within or beyond the statute, held that a fair test of the question is 'between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain and such activities as are essential to those purposes.' ''

Syllabus No. 3 of the same case reads:

''Corporation organized to mine and sell coal, and manufacture and sell coke, and engaged in business of buying and selling coal lands, which continued to hold 400 acres of undeveloped coal properties, and held capital stock of subsidiary properties, and held capital stock of subsidiary engaged in holding coal lands, held subject to excise tax, under Revenue Act 1918 * * * as 'carrying on or doing business,' though corporation was not engaged in mining and selling coke.''

In the case of *Commonwealth v. Wilkes-Barre & H. R. Co.,* 251 Pa. 6, 95 A. 915, we read:

''Whether a foreign corporation is 'doing business' within the state is a question of fact, and the tests are whether such corporation has an agent or offices for the general conduct of its business or conduct its cor-

porate affairs in the state or has its capital therein invested.''

In *Rose v. Nunnally Inv. Co.,* 22 F. (2d) 102, we find a quotation from *Von Baumbach v. Sargent Land Co.,* supra, as follows:

" 'It is evident, from what this court has said in dealing with the former cases, that the decision in each instance must depend upon the particular facts before the court. The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails, and doing only the acts necessary to continue that status, and one which is still active, and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain and such activities as are essential to those purposes.' ''

In *Eaton v. Phoenix Securities Co.,* 22 F. (2d) 497, the corporation was organized for the sole purpose of holding shares in other insurance companies for the Phoenix Insurance Company, which, like Ernest M. Welch, could not hold the stocks. The corporation had no independent office, paid no rent and no salaries. There was some increase in investment. The court held this did not amount to ''doing business''. To the same effect see *United States v. Three Forks Coal Co.,* 13 F. (2d) 631; *Cannon v. Elk Creek Lbr. Co.,* 8 F. (2d) 996.

The defendants state that ''doing business'' includes ''activities in pursuit of profits''. The Welch Holding Company entered into no activity in pursuit of profits. They had no capital invested. Defendants rely, to show profit-making activities of the plaintiff in the years 1929 and 1930, upon the following: The stock of one corporation was exchanged for another. This exchange took place in the year 1928, we believe from the

534

testimony, which was before the periods here under consideration, and is therefore not material. We also note that it was done principally as an accommodation to Mr. Welch's brother-in-law, and not for the purpose of making a profit. Another matter relied upon by defendants is that all of the stock of one corporation was sold. Liquidation of a capital asset cannot be held to be "doing business", in the absence of a course of purchases and sales. There was no re-investment of these funds, and this transaction was not "in the course of business" of the Welch Holding Company, but was collateral thereto. Defendants also contend that the proceeds from the sale of stock were advanced to a California corporation. This "loan" was made for the benefit of the stockholders of the plaintiff. No interest was charged and the "loan" was not in any way for the benefit of the plaintiff. We do not deem this an activity in pursuit of gain. Defendants further contend that title to a parcel of land was held and conveyed in the name of the corporation, and taxes thereon were paid from corporate funds. Mr. Welch acquired this piece of land and it was sold by him individually for his own benefit. The corporation was merely holder of the legal title as trustee. Payment of taxes from the corporation funds was a distribution for Mr. Welch's benefit. There was no profit-making activity in this connection or any intention that there should be any profit. It does not appear that the plaintiff was organized for the purpose of control, through stock ownership, of the subsidiary corporations.

The purpose of the formation of the plaintiff company was to prevent the imposition of federal income taxes on Mr. Welch because of his trust. It appears that he was advised to take such a course for that purpose

by his attorney and a representative of the federal government.

The president of a stock holding corporation is nothing more than a representative of a stockholder of the subsidiary, and as such can participate in the affairs of the subsidiary only as a stockholder. The object of Mr. Welch and his associates was not the selling of the management services of Mr. Welch but the making of profits through the operations of the businesses in which the investments were made by the subsidiary companies. There was at all times only one manager of the operating companies and that was Mr. Welch. The management which he exercised was by virtue of the fact that he was an officer of the operating companies. The affairs of a corporation are directed by its officers and not by its stockholders. Prior to the formation of the Welch Holding Company, Mr. Welch was an officer in each of the operating companies and as such directed their activities. He remained an officer of each of these operating companies after the formation of the Welch Holding Company. His election as president of the Welch Holding Company did not give him any power to direct the affairs of the operating companies. He was, as president of Welch Holding Company, only the chief officer of the holder of the legal title to the majority of the stock of the operating companies. His only possible right in that capacity was to represent the principal owner of the legal title to the stock of the operating companies in the election of directors to those companies. At all times he acted as an officer of the operating companies.

The plaintiff corporation, during the years 1929 and 1930, was merely a conduit or intermediary through which the dividends of the operating companies

passed to the real stockholders of those companies, and the plaintiff had no income of its own which was subject to taxation. Where a corporation is the mere agency or instrumentality of its stockholders, the corporate entity will be disregarded for tax purposes: *Ehrman v. Galloway,* supra; *Southern Pacific Co. v. Lowe,* 247 U. S. 330, 62 L. Ed. 1142, 38 S. Ct. 540; *Gulf Oil Corp. v. Lewellyn,* 248 U. S. 71, 63 L. Ed. 133, 39 S. Ct. 35; *Moro Realty Holding Corp. v. Commissioner of Internal Revenue,* 25 B. T. A. 1135; *Greenleaf Textile Corp. v. Commissioner of Internal Revenue,* 26 B. T. A. 737. A corporation which is a mere conduit or trustee through which income passes has no taxable income: *North Jersey Title Ins. Co. v. Commissioner,* supra; *United States v. Jelenko,* 23 F. (2d) 511; *112 West 59th St. Corp. v. Helvering,* 68 F. (2d) 397; *Mark A. Mayer v. Commissioner of Internal Revenue,* 36 B. T. A. 117; *Stewart Forshay v. Commissioner of Internal Revenue,* 20 B. T. A. 537.

■Defendants seek to defeat plaintiff's claim for refund in the alternative, that if the excise tax is not due intangibles taxes in a greater amount are due for 1930 and that defendants can recoup the amount of such taxes. The intangibles income tax law, section 69-1420, Oregon Code Supplement 1935, provides in part that a tax is imposed upon every corporation, which tax shall be levied, collected and paid annually at the rate of 8 per cent with respect to the taxpayer's net income, as defined in the act. As we have seen, the Welch Holding Company had no income; therefore it is not subject to the imposition of an intangibles tax.

The dividends paid by the operating companies were not treated as income of the Welch Holding Company but were treated as belonging to the stockholders and

were distributed to them currently as received, without any declaration of dividends.

■■ The doctrine of recoupment is recognized in this state. The plaintiff and defendants seem to agree that recoupment is an equitable defense arising out of some feature of the transaction on which the plaintiff's action is grounded, but is confined to such matters. See *Krausse v. Greenfield*, 61 Or. 502, 123 P. 392, Ann. Cas. 1914 B, 115. In view of the careful distinction made by this court between the intangibles tax, the income tax and the excise tax in *Redfield v. Fisher*, 135 Or. 180, 292 P. 813, 295 P. 461, 73 A. L. R. 721, we are of the opinion that it cannot be held that the right, if any, of the state to collect an intangible tax for 1930 arises out of or is in any wise related to the plaintiff's cause of action here. As shown in the Redfield case, the intent of the legislature was to reach an entirely different subject of taxation.

■ In determining whether a corporation is liable for an excise tax each case must depend upon its own particular facts.

We have examined a large number of authorities, many more than we have mentioned in this memorandum and have given this important matter our best thought and have carefully considered the able briefs. Our conclusion is that plaintiff is entitled to the refund claimed.

The judgment of the circuit court is therefore affirmed.

BELT, J., not sitting.