## EQUITABLE SAVINGS & LOAN ASSOCIATION v. STATE TAX COMMISSION

William E. Love and Joseph Hanna, Jr., Portland, Oregon, represented plaintiff.

Gerald F. Bartz, Assistant Attorney General, Salem, Oregon, represented defendant.

Decision in part for plaintiff and in part for defendant rendered May 5, 1967.

EDWARD H. HOWELL, Judge.

This is a suit to obtain a refund of corporation excise taxes paid by plaintiff for the years 1960 to 1962, inclusive, and to set aside certain corporation excise tax assessments for the years 1958 through 1963, inclusive.

The first issue is whether plaintiff is doing busi-

ness in states outside of Oregon and entitled to apportion its income under ORS 314.280 and State Tax Commission Reg 4.280 which allow financial institutions to apportion their income using a three-factor formula of gross payroll, mortgage loans and interest.

The plaintiff is a stock-owned savings and loan association specializing in making improved real estate loans and has its headquarters office in Portland, Oregon. Plaintiff has twenty-two branch offices in Oregon, four in Washington and one in Idaho. Plaintiff's business activities are becoming increasingly centralized in Portland because of the necessity of maintaining control over an expanding operation. All loan applications are submitted to the loan committee in Portland for its approval. Payroll and employee records are maintained, auditing and advertising and central accounting conducted, and all of plaintiff's business control is centralized in the Portland headquarters.

Plaintiff has been doing business in Washington since 1899 and has branch offices in Seattle, Tacoma, Spokane and Yakima. These offices originated and processed their own mortgage loans with final approval made by the loan committee in the Portland office. Plaintiff does not have an office in Vancouver, Washington, but does a substantial business in Clark County. Until approximately six years ago plaintiff employed a solicitor who solicited and processed all Clark County loans. Thereafter the loans were solicited and processed by a chief appraiser who lives in Vancouver, Washington. Most of the loans are builder's loans which are solicited and processed on the job but occasionally the loan documents are executed in the Portland office. During the years involved plaintiff aver-

aged approximately six million dollars in outstanding loans in the southwestern Washington area.

Plaintiff has been qualified to do business in Idaho since 1906. The Idaho loans are made through approximately fifteen loan agents who are local men in the real estate and insurance business and receive a finder's fee from plaintiff for making the loans. They solicit the loans, prepare the applications and credit reports, make the appraisals and send all documents to the Portland office for approval. The loan documents are signed in Idaho and the funds are disbursed by the agent to the borrowers. Collections are also made by the agents. Plaintiff had approximately $450,000 to $500,000 in outstanding loans in Idaho.

Plaintiff's California loans originated almost entirely through brokers, mostly in the Los Angeles area. Plaintiff made two types of loans in California—straight loans and participation loans. In the former plaintiff was the direct lender and would receive a note and mortgage from the borrower. On these loans plaintiff would have the property appraised and the loan committee from Portland also inspected the property. Plaintiff had about five million dollars outstanding in straight loans in California. In the participation loans plaintiff would purchase a percentage of the loans that a mortgage broker or savings and loan association offered to sell. Plaintiff's officials would check over the credit reports and the appraisal, inspect the property and the area involved and, if satisfied, buy a percentage of the loan. The local association would service the loan, handle the collections, delinquencies and foreclosures, if any. Plaintiff had approximately six million dollars outstanding in California participation loans.

During the years 1961 to 1963 plaintiff held a loan on a cooperative apartment in Hawaii. Plaintiff was advised of the possibility of the loan through a Los Angeles broker. One of the members of plaintiff's loan committee made an on-site inspection, checked the location of the apartment, the sale of the units, met with the architect and contractor, and the committee approved the loan in the amount of $1,760,000. The loan was closed in Hawaii and a local organization made the collections and serviced the loan.

The final out-of-state loans involved are denominated Capehart Loans. These loans were established by the federal government to finance the construction of housing for the families of military personnel around large military bases. The loans made by plaintiff and other similar organizations were interim construction loans which were eventually taken over from the plaintiff by the Federal National Mortgage Association after the construction was completed. The loans originated and were closed in Washington, D. C. Plaintiff's officers made several inspection trips to observe the progress of the construction of the various projects in which it was interested. Plaintiff was not involved in any of these loans in Oregon. During the three years Equitable was participating in the program it had approximately one hundred million dollars involved in Capehart Loans.

Plaintiff is entitled to apportion its income if it is doing business outside the state of Oregon. ORS 314.280 and State Tax Commission Reg 4.280. Since the decision of the Oregon Supreme Court in *Welch Holding Co. v. Galloway*, 161 Or 515, 89 P2d 559 (1939), "doing business" has been defined as "engaging in activities in the pursuit of gain." This definition has

been accepted by this court and repeated by the Oregon Supreme Court in *Cal-Roof Wholesale v. Tax Com.*, 242 Or 435, 440, 410 P2d 233 (1966); *Dutton Lbr. Corp. v. Tax Com.*, 228 Or 525, 365 P2d 867 (1961); *John I. Haas, Inc. v. Tax Com.*, 227 Or 170, 361 P2d 829 (1961); *Ore. Mut. Sav. Bank v. Commission*, 2 OTR 124 (1965). In the *Oregon Mutual Savings Bank* case, *supra*, this court found that the Oregon Mutual Savings Bank was doing business in Washington and California when it engaged in soliciting loans, appraising property, loaning the funds and on occasion foreclosing the mortgages. The facts in the instant case are similar and when the plaintiff made the loans, all of which were substantial, and conducted all the other activities incidental to the loans in states outside of Oregon it was engaging in activities in the pursuit of gain. Consequently plaintiff is entitled to apportion its income under ORS 314.280 and Reg. 4.280.

The next issue is whether the interest income from and the value of the out-of-state mortgage loans should be allocated to Oregon under the apportionment formula as the defendant contends or whether they should be allocated out of state as the plaintiff argues. The parties are agreed that the Washington loans that were "originated and processed" through plaintiff's branch offices in Seattle, Tacoma, Spokane and Yakima are properly allocated to the out-of-state portion of the apportionment formula.

Any method of allocation under the apportionment formula must, to a certain extent, be arbitrary and fictitious. *Dutton Lbr. Corp. v. Tax Com.*, *supra*. ORS 314.280(2) states that the allocation formula is designed to allocate on a fair and equitable basis a proportion of plaintiff's total earnings to Oregon. In

*Klamath Production Credit Assoc. v. Commission,* 3 OTR 16 (1967), this court held under similar facts that both the interest income and the out-of-state loans were properly allocated to the out-of-state portion of the apportionment formula. The same rule should apply in this case. The foreign states are substantial economic factors in the production of plaintiff's interest income and the payments on the loans. *Amer. Refrig. Transit Co. v. Tax Com.,* 238 Or 340, 395 P2d 127 (1964). The loans are solicited, the appraisals and credit reports executed, the loans closed, and the funds generally disbursed in the states where the property is located. The funds used to repay the loans, like the interest payments, are secured from the economy of those states. The courts and the laws of these states have jurisdiction and control over the property which is the security for plaintiff's loans. The fact that plaintiff does not operate from a branch office in these states is not as important as the economic relationship between the property and the foreign state. As the plaintiff argues, if the existence of a branch office were the controlling factor then Oregon could allocate all of plaintiff's out-of-state income to Oregon because plaintiff did not have a branch office although it was actually doing business out of the state. This would not be apportioning the income on a fair and equitable basis as required by the statute.

■ The tax commission has agreed that the interest and loans solicited and processed through the plaintiff's Washington offices are properly allocable to Washington. The same allocation should apply to the rest of the Washington loans. The loans, whether made in southwestern Washington or through one of the branch offices, are generally handled in the same manner. The loans are solicited, the property appraised

and the loans closed in Washington. In both instances the decision to make the loan is made in Oregon. The only apparent difference would be that the loan document might be typed in Portland because of the absence of an office in southwestern Washington and, of course, the plaintiff could not receive savings deposits from customers in southwestern Washington because of the lack of an office. Otherwise, there does not appear to be any substantial difference in plaintiff's operations in Washington with or without a branch office. The out-of-state loans on out-of-state property and the interest received therefrom should be allocated to the out-of-state portion of plaintiff's income.

Plaintiff also contends that the defendant's excise tax assessments against it for the years 1958, 1959 and 1960 are invalid because the notice of deficiency and proposed assessment was incomplete. ORS 314.405 pertaining to the issuance of a notice of proposed deficiency states in part:

"* * * If the commission discovers from the audit of a return or otherwise that a deficiency exists, it shall compute the tax and give notice to the taxpayer of its proposal to assess the deficiency, plus interest and penalty for fraud or negligence, if any attaches. The notice shall state the reason for each proposed adjustment to the return and *a reference to the statute, regulation or commission ruling* upon which the proposed adjustment is based. * * *" (Emphasis supplied.)

■ The notice of deficiency and proposed assessment received by plaintiff for the years 1958, 1959 and 1960 did not contain any reference to the statute, regulation or commission ruling upon which the proposed assessments were based. Plaintiff contends this was fatal. It was not. The commission erred in not strictly.

following the statute, but the obvious purpose of citing the statute or regulation to the taxpayer is to give notice of the basis for the proposed deficiency assessment. The evidence clearly indicated that from the beginning the plaintiff was fully cognizant of the legal issues involved and the basis for the proposed assessment. It was not misled in any way. There is no basis for plaintiff's contention in this regard.

The next issue is whether the sums which plaintiff is required under Oregon law or federal law to set aside as reserves for bad debt and real estate losses are deductible either as additions to a reserve for bad debts or as ordinary and necessary business expenses.

ORS 722.150 requires the plaintiff as a savings and loan association to set aside ten percent of its income annually as an addition to a reserve for bad debts. The federal law and regulations (12 USC 1726, and regulations 563.11 to 563.14 of Title 12, Code of Federal Regulations) also require insured associations to set aside similar reserves.

ORS 317.280 allows as a deduction from net income a reasonable addition to a reserve for bad debts. The defendant's Reg 317.280(1)-(E) states that a reasonable addition to a reserve for bad debts depends upon the facts of each case. Consideration must also be given to the loss record, the total amount of the existing reserves and the fact that the reserve is not a reserve for contingent losses. *Baker Prod. Cr. Assoc. v. Commission,* 2 OTR 191, *affirmed,* 245 Or 352, 421 P2d 984 (1966).

The plaintiff argues that when the legislature established a mandatory contingent fund by ORS 722.150 it foreclosed the question of whether additions to the

reserve are deductible under ORS 317.280 or as ordinary and necessary expense under ORS 317.255. The plaintiff offered no evidence to establish any loss record nor indicated the size of its contingent fund.

In *Bellefontaine Fed. Savings & Loan Ass'n v. Commissioner,* 33 TC 808 (1960), the taxpayer sought to sustain as a deduction an addition to a federal insurance reserve account on the grounds that the addition to the reserve was mandatory under the regulations of the Federal Home Loan Bank Board. The additions to the reserve were not allowed by the Internal Revenue Code. The Tax Court summarily dismissed the taxpayer's contention that the conflict between the Internal Revenue Code and the regulations regarding the mandatory reserve additions should be resolved by allowing the deduction. The court said:

> "* * * This contention is without merit, since it has been consistently held that the accounting requirements of regulatory agencies are not controlling in the application of the revenue laws, which establish their own standards. *Old Colony R. Co. v. Commissioner,* 284 U.S. 552, 562, *Kansas City Southern Ry. Co. v. Commissioner,* 52 F. 2d 372, 378, (C.A. 8); *Toledo Terminal Railroad Co.,* 13 T.C. 64, 75; *Gulf Power Co.,* 10 T.C. 852, 858, *National Airlines, Inc.,* 9 T.C. 149, 161." 33 TC at 811.

See also *Newport Federal Savgs. & Loan Assn. v. U. S.,* 259 F Supp 82 (DC Ark 1966), 18 AFTR2d 5950, 66-2 USTC ¶ 9702.

In *South Side Bldg. & Loan Assn. v. Hooks,* 188 F Supp 652 (DC Ohio 1960), 6 AFTR2d 5610, 60-2 USTC ¶ 9713 and *Central Savings Assn. v. Hooks,* 188 F Supp 654 (DC Ohio 1960), 6 AFTR2d 5611, 60-2 USTC ¶ 9714, the taxpayers contended that they

should be allowed to deduct mandatory additions to a reserve account required by regulations of the Federal Deposit Insurance Corporation and the state laws of Ohio when the additions were in excess of those allowed by section 593 (adding to reserve for bad debts) of the Internal Revenue Code. There was no evidence of losses warranting the claimed deductions. The plaintiffs contended, as the plaintiff does in this case, that the federal regulation and the laws of Ohio constituted special legislation which controlled the Internal Revenue Code and justified the deduction. The court, on the basis of the *Bellefontaine* case, and the cases cited therein, found that the revenue statutes controlled the taxpayer's eligibility for the deduction and denied plaintiffs' claims.

■ There is nothing in the Oregon tax statutes or the defendant's regulations which allows additions to bad debt reserves to be deducted merely because such reserves are required by other statutes or regulations without a showing of reasonableness and a loss experience warranting the deductions. Plaintiff is not entitled to the deduction as an addition to its reserve for bad debts.

■ Neither is plaintiff entitled to the deduction as an expense under ORS 317.255 which allows the taxpayer to deduct all ordinary and necessary expenses paid during a taxable year in carrying on a business.

In *Wayne Title & Trust Co. v. Commissioner of Internal Rev.*, 195 F2d 401, (3rd Cir 1952), 41 AFTR 401, 52-1 USTC ¶ 9264, the taxpayer, who sold title insurance, was required by Pennsylvania law to maintain a prescribed percentage of title insurance premiums in a re-insurance reserve. The taxpayer contended that the addition to the required reserve was

an ordinary and necessary business expense. The court found that the reserve was one to cover contingent losses as compared to fixed losses and although it was mandatory it was not deductible as an expense. The same result was reached in *Spring Canyon Coal Co. v. Commissioner of Int. Rev.*, 43 F2d 78 (10th Cir 1930), 9 AFTR 78, 2 USTC ¶ 574; *cert. denied*, 284 US 654, 52 S Ct 33, 76 Led 555 (1931), where the court found that reserves required under the workmen's compensation act were not deductible as expenses. The deductions were also disallowed as expenses in *Philadelphia Title Insurance Co. v. Commissioner*, 17 TC 1068 (1951) and in *American Title Co. v. Commissioner*, 29 BTA 479 (1933), where the court held that a reserve set up to meet future liabilities under title insurance policies is not deductible from gross income.

The last issue is whether the plaintiff is entitled to deduct certain premiums paid to the Federal Savings and Loan Insurance Corporation (FSLIC) as an ordinary and necessary business expense for the year 1962.

In 1960 the plaintiff's accounts became insured by the FSLIC, an agency of the federal government. For this insurance the plaintiff pays an insurance premium which is added to FSLIC's primary insurance reserve. The parties agree that this premium has always been deducted by plaintiff as an ordinary and necessary business expense and is not involved in this case. Effective in 1962 Congress required all insured savings and loan associations to pay an additional premium over and above the regular premium in order to strengthen the FSLIC reserves. This premium is placed in a secondary insurance reserve, the earnings retained by FSLIC and the secondary reserve is available for the losses of FSLIC only to the extent the

primary reserve is insufficient. Plaintiff can regain the sums paid into this secondary reserve if it liquidates and if FSLIC has them available.[1]

The Internal Revenue Service (Rev Rul 66-49, 1966-1 Cum Bull 36) has held that payments made to this secondary reserve account by savings and loan associations are not deductible.[2]

---

[1] The history of the Federal Savings and Loan Insurance Corporations and the two reserves is found in S. Rep. No. 778, 87th Cong., 1st Sess., Committee on Banking and Commerce, and in H.R. Rep. No. 823, 87th Cong., 1st Sess., Committee on Banking and Commerce.

[2] Rev Rul 66-49, 1966-1 Cum Bull 36:

"Under section 404 of the National Housing Act, as amended, all institutions insured with the Federal Savings and Loan Insurance Corporation (FSLIC) are required to pay regular premium charges for such insurance (12 U.S.C. 1727(b)). They are also required to pay certain additional annual premiums, referred to as premium prepayments (12 U.S.C. 1727(d)) which may be suspended under certain circumstances (12 U.S.C. 1727 (g)). These additional premiums, which are treated as assets of each institution by the Federal Home Loan Bank Board and the FSLIC, are recorded in a separate, or 'secondary', reserve account and are available for the losses of the FSLIC only to the extent that the regular, or 'primary', reserve is insufficient. Each institution's balance in the secondary reserve account is credited each year with a return, representing investment earnings on the prepayments, at a rate which is equal to the average annual rate of return on the FSLIC's investments (12 U.S.C. 1727(e)).

"When the sum of the secondary and primary reserves of the FSLIC reaches a specified level, the requirement for additional premiums will be suspended (until the reserves drop to a lower specified level) and each institution's balance in the secondary reserve will be used to pay its regular annual premiums. When the primary reserve alone reaches a specified level, the requirement for payment of additional premiums will terminate and the balance, if any, of the secondary reserve will be distributed, in cash, to the insured institutions (12 U.S.C. 1727(g)). If an institution ceases to be insured for any reason, its balance in the secondary reserve of the FSLIC will be refunded to it (12 U.S.C. 1727(f)).

"* * * * *

"The facts indicate that a savings and loan institution retains at all times an interest in the secondary reserve fund

The tax commission relies upon the revenue ruling to deny the deduction of the secondary reserve premium payments. The Commissioner of Internal Revenue denied the deduction on the grounds that the savings and loan association paying the additional premium retained an interest in the secondary reserve fund which was returnable under certain circumstances. It would seem that the interest retained by the plaintiff would be contingent on the existence of the fund. The secondary reserve fund is maintained by the FSLIC to pay losses incurred by them and if the primary fund is depleted, the secondary reserve fund would be used to make up such losses.

■ The plaintiff's payments into the FSLIC secondary reserve fund are comparable not only to the premiums paid into the primary fund, which are concededly deductible, but are also comparable to prepaid insurance premiums. Under the defendant's Reg 316.305(1)-(E) these premiums are handled as follows:

> "Premiums paid on policies covering periods of more than one year may be deducted when paid by a taxpayer reporting on a cash basis but must be prorated over the life of the policy by a taxpayer reporting on an accrual basis. When any part of a premium which has been deducted as expenses is returned to the insured, the amount refunded shall be included in the gross income of the year in which the premium is returned."

---

equal to the unexpended portion of its contributions thereto the amount of which is readily determinable and which is returnable to it, under specified circumstances. Accordingly, these additional payments are not deductible until they are used to pay regular premiums or losses, or the possibility of their return to the institutions is otherwise precluded."

It has been stipulated that plaintiff is on a cash basis. Consequently, under the above regulation it is not required to prorate the premiums but may deduct them when paid.

Plaintiff is required to pay both the primary and secondary premiums. The fact that it may receive some benefit from the secondary reserve some time in the future if certain events transpire should not affect its right to deduct both payments as an expense at this time. Under the regulation, *supra*, if plaintiff does receive such benefits in the future, the amount refunded will be included in gross income at that time.

The plaintiff is doing business outside of Oregon in the states mentioned and entitled to apportion its income; the interest and gross loan factors on out-of-state property should be allocated to the out-of-state portion of the formula; the plaintiff cannot complain of the lack of notice in the notice of deficiency and proposed assessment; plaintiff is not entitled to deduct additions to the reserve accounts either as bad debts or expenses; plaintiff is entitled to deduct as an expense the additional insurance premiums paid to the FSLIC.