Argued March 15, reversed May 10, 1961

# JOHN I. HAAS, INC. v. STATE TAX COM- MISSION

### 361 P. 2d 820

*Alfred B. Thomas*, Assistant Attorney General, Salem, argued the cause for appellants. With him on the briefs were Robert Y. Thornton, Attorney General, Salem, and Carlisle B. Roberts, Assistant Attorney General, Salem.

*Alfred H. Stoloff*, Portland, argued the cause for respondent. With him on the brief were Phillips, Coughlin, Buell & Phillips, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

WARNER, J.

John I. Haas, Inc., a Delaware corporation (hereinafter called Haas), brought suit in the Circuit Court for Marion County to reverse and set aside an order of defendant Tax Commission which held Haas liable for corporation excise tax deficiencies in years 1950 and 1951. The Commission appeals the order of that court declaring the deficiency null and void.

Haas has its principal office and place of business in Washington, D.C. It is engaged in the production, buying and selling of hops. Its sales are made principally to breweries in the United States and elsewhere.

Prior to and during the tax years in question, Haas was the owner of certain farm lands in this state which it used for the growing of hops. It contends this activity constituted its only business in

Oregon which made it subject to Oregon's corporation excise tax. These farm lands were managed and operated for Haas by A. J. Ray and Sons, Inc., an Oregon corporation (hereinafter called Ray). This particular agency is not, however, in dispute.

Haas also purchased hops in Oregon for eventual sale elsewhere as customers were found. During the tax years above mentioned Ray was active in connection with all hop purchases made in this state by Haas in those years. Whether Ray was thus acting as an agent or independently engaged in buying and selling to Haas for its own profit is one of the questions to be resolved on this appeal.

Prior to 1950 Haas paid its Oregon corporation excise tax solely on net income from its Oregon hop farms. This was calculated and reported by segregating the hop farm sales from all other sales made by plaintiff and deducting from these Oregon hop farm sales: (1) the actual cost of goods sold on the hop farms; and (2) expenses estimated by taking the percentage plaintiff's total expenses bore to Haas's total sales and applying this percentage to its actual Oregon sales. The Oregon corporation excise tax rate was then applied to this net income figure. Haas had followed this same method in computing its taxable income for the years 1950 and 1951. Rejection of its returns by the Commission is the genesis of the instant litigation.

In 1950 and 1951 the Commission revised its method of assessing plaintiff's tax by refusing to permit it to report its net income on a segregated basis, i.e., hop farm income only, and required plaintiff to report its net income as determined on an apportioned basis on the theory that Haas's operations in this state constituted a "unitary business." Haas does business in

other states and if found to also do business in this state, in addition to the operation of its hop farms, its activities are, therefore, within the purview of § 110-1507, OCLA (now ORS 314.280), which provides the method of determining its net income. § 110-1507, OCLA, reads:

"(a) If the gross income of a corporation is derived from business done both within and without the state, the determination of net income shall be based upon the business done within the state, and the commission shall have power to permit or require either the segregated method of reporting or the apportionment method of reporting, under rules and regulations adopted by the commission, so as fairly and accurately to reflect the net income of the business done within the state.

"(b) The provisions of subsection (a) dealing with the apportionment of income earned from sources both within and without the state of Oregon are designed to allocate to the state of Oregon on a fair and equitable basis a proportion of such income earned from sources both within and without the state. * * *" (Oregon Laws 1939, ch 489, § 3, p 987)

The method adopted by the Commission to apportion income of a foreign corporation so as to accurately reflect income from business within Oregon consisted of determining the average proportion the corporation's Oregon property, wages and sales bore to the corporation's total property, wages and sales; and then to use this proportion as the percentage of the corporation's total net income which resulted from business done within Oregon. See the Commission's Regulations, Art 507-2 (1951), infra. Plaintiff does not contest that formula. It only challenges the propriety of applying it as the Commission has done.

The 1959 tax regulations further elaborate on the

concept of "unitary business" as expressed in Art 507-2 of the 1951 Regulations, supra. Regulation 4.280 (1)-(B) now provides:

"* * * The term 'unitary business' means that the taxpayer to which it is applied is carrying on a business, the component parts of which are too closely connected and necessary to each other to justify division or separate consideration as independent units. * * * Basically, if the operation of a business within Oregon is dependent on or contributes to the operation of the business outside the state, the entire operation is unitary in character, and the income from Oregon activities will be determined by the apportionment method. * * *"

We deem it an appropriate definition of "unitary business" to apply here. See *Butler Bros. v. McColgan,* 315 US 501, 86 L ed 991, 62 S Ct 701 (1942); *Adams Express Co. v. Ohio State Auditor,* 165 US 194, 41 L ed 683, 17 S Ct 305.

The application of the apportionment formula resulted in an allocation of slightly over 8 per cent of plaintiff's total net income to Oregon for each tax year. This was the result of the inclusion of sales of certain hops not grown on Haas's Oregon farms which were purchased for it by Ray in Oregon.

In so doing, the Commission held that Haas's farming operations and dealer operations throughout the United States constituted one business; and that Haas's business was, therefore, unitary.

Plaintiff protested the Commission's refusal to allow a report of its net income on a segregated basis to the Commission. It argues (1) that Ray was not its agent, but an independent contractor buying and selling for its own profit; and (2) asserts that even if Ray is held to be Haas's agent, it does not necessarily

follow that Haas was "doing business in Oregon" so as to subject it to the tax imposed by the Commission on a unitary basis.

In support of the second proposition, Haas asserts that requiring it to report net income on an apportioned basis results in a tax on its business done in interstate commerce and such a tax would violate the Oregon corporation excise law and the commerce and due process clauses of the Constitution of the United States. These propositions are reflected in the findings of the circuit court and are made the basis for the Commission's contentions on this appeal.

This appeal, therefore, poses the following questions:

1. Was Ray the agent of Haas in 1950 and 1951 when buying hops for Haas or was he an independent contractor who was buying hops on his own account and reselling to Haas?

2. If Ray was Haas's agent in the 1950 and 1951 transactions, were they activities of a character that warrant a declaration that Haas was "doing business in this state," thereby making Haas amenable to the payment of an excise tax for the privilege of so doing?

3. Are the provisions of the due process and commerce clauses of the United States Constitution contravened by the levy of the excise tax which the Commission attempts to make?

### The Agency of A. J. Ray and Sons, Inc.

◼ We first give attention to the activities of Ray to determine whether they constitute it Haas's agent in Oregon with reference to the acquisition by Haas of hops raised in Oregon hop yards other than those which Haas owns and farms in this state.

From our reading of the record, it appears that

the procedures followed by Haas and Ray in the tax years 1950 and 1951 were the same for each transaction dealing with purchases of "futures," and substantially the same in deals for the purchase of "spot hops." The acquisition of future hops, i.e., a crop yet to be grown and harvested later in the year, was as follows: Ray would approach an Oregon hop grower early in the season and make a verbal offer for the grower's crop when harvested. If approved by the grower, Ray would immediately communicate this information by telegram to the Haas office in Washington, D. C., and if acceptable to Haas, it would promptly reply to Ray by the same medium. Thereupon, the grower was notified and one of Ray's employees would prepare a contract, wherein Haas is described as the buyer and the grower as the seller.

These contracts were on printed forms with blanks for insertion of details applying to the particular transaction subsisting between Haas as the buyer and the grower as the seller. Most of them contemplated three payments to the grower. The first two were advances made during the growing season to assist the grower in producing the contracted crop. The third or last payment was made to the grower upon harvest of the crop and after inspection by the buyer as to the quality and quantity of the crop. From the last payment on the purchase price Haas, as the buyer, deducted the amount of the earlier advances.

The contract by its terms served a double purpose. It was both a firm sales agreement between Haas and the grower, and also a mortgage upon the grower's crop to secure the advances made to the grower during the growing season and to secure such damages as the buyer might sustain.

After the acceptance by Haas of the grower's offer

made through Ray and Ray's preparation of the contract, the contract was presented to the grower for his signature, who at the time of signing received his first advance payment from Ray. It was then forwarded by Ray to Washington for the signature of Haas. When that detail was accomplished the contract was promptly returned to Ray for immediate recording in the chattel mortgage records of the county where the grower's hop farm was situated.

Ray would also make the second advance when due and the final payment after harvest. But after having made each given payment to the grower as required by the sales contract, Ray would promptly draw on Haas for such amounts and receive reimbursement within the course of a few days.

After final payment to the grower Ray would warehouse the hops in Ray's name and then bill Haas for insurance, warehouse charges and Ray's commission on a poundage basis previously established by agreement. When asked why the hops were warehoused in Ray's name, Mr. Harold Ray, president of the corporation, stated it was merely a matter of convenience to Haas and expedited later shipping instructions from Haas.

The hops so acquired for Haas remained warehoused subject to Haas's shipping orders. These orders directed bills of lading to out-of-state brewers with whom Haas dealt directly. The bills were always made showing Haas, not Ray, as the shipper, and with Haas's address as Hillsboro, Oregon, and were so executed in Haas's behalf by Ray, acting through one of its employees.

The great bulk of the transactions had in Oregon by Ray in behalf of Haas were related to growers' contracts; that is, the purchase of "futures"; and they

are the transactions with which we are here primarily concerned. As stated by Mr. Harold Ray, these future contracts constituted "ninety per cent or more" of Ray's activities in Oregon in behalf of Haas.

The pattern followed with reference to the "spot hop" purchases was, as we have noticed, "very much the same." The procedure in that category was for Ray to acquire samples from growers after harvest and send them forward for inspection by Haas. If satisfied, Haas notified Ray and the latter closed the deal with its own funds in the first instance, followed by prompt reimbursement from Haas. "Spot hops" were warehoused as were the contract hops and thereafter subject to Haas's shipping orders.

Ray also performed two other related services for Haas worthy of note. At the close of the season, Ray, acting through one of its employees, would, in Haas's name, execute satisfactions of the contract-mortgages previously recorded.

During the years 1950 and 1951 Haas was subject to the Federal Hop Control Act. Ray would pay the required assessments and later be reimbursed by Haas. The federal hop certificate in evidence describes Haas as "the handler." Its name was signed by one of Ray's employees. During this period Ray was not registered under this program and paid no assessment on its own account.

Haas was the only party served by Ray during the years 1950 and 1951.

From the moment that the hop contracts were executed by Haas up to the time of the harvest of the crop, Haas was a mortgagee-lienor, with a contract to purchase. Upon Haas's acceptance after harvest, its status changed to owner. At no time before or after the making of the contract with the grower did Ray

have or claim to have any title to the hops which it could sell to Haas. The mere fact that the hops purchased were warehoused in the name of Ray, as a matter of convenience to Haas, did not dilute Haas's title thereto or confer on Ray the status of owner. At no time in the course of Ray's dealings for Haas did Ray have any prospect of profit in the hops acquired by Haas beyond his compensation measured by its commissions, nor did it assume any economic risks other than those legally incident to such an agency. It is but one of the circumstances which tend to confirm that Ray was an agent for Haas, operating at all times subject to its direction.

■ One of the distinctive functions of an agent, and sometimes called the primary purpose, is to bring his principal into contractual relation with third parties. *Thomas v. Smith-Wagoner Co.*, 114 Or 69, 77, 234 P 814 (1925); *Carstens Packing Co. v. Gross*, 131 Or 580, 584, 283 P 20; 2 Am Jur 14, Agency § 3. This is precisely what Ray did for Haas and thereafter continued to serve Haas subject to its directions in Haas's relation to the grower with which it made a contract.

■ When an agent purchases goods for a principal and for a commission, even though the agent pays the purchase price and accepts delivery, and then redelivers the goods to his principal, who reimburses the agent for all costs and expenses, the relationship between agent and principal is not a "vendor and vendee relationship." *Carmichael v. Lavengood*, 112 Ind App 144, 44 NE2d 177, 180 (1942); *D'Acquisto v. Evola*, 90 Cal App2d 210, 202 P2d 596, 598 (1949); *Russell v. Republic Production Co.*, 112 F2d 663, 665 (5th Cir 1940). See, also, 3 CJS 102, Agency § 197a, and 1 Mechem, Agency (2d ed), 658 § 918. The method employed by Ray in purchasing hops for Haas is sub-

stantially the same method employed by Butchart in acquiring stock for his principals, the defendants, in *Barnes v. Eastern & Western Lbr. Co.,* 205 Or 553, 577-579, 287 P2d 929 (1955).

██ Haas takes the position that because Ray was under obligation to make good defects in quality or shortages in weight, this constitutes an important distinction bearing upon the status of Ray as an agent. But assuming such an obligation was imposed on Ray, it does not impair the character of an agency or solve the problem here presented. The law is that if Ray, as an agent, contracted with Haas, as principal, to buy a certain type of hops of a certain weight and did not do so, Ray, as agent, would in normal course be liable to Haas for damages ensuing from the breach. 2 Restatement 908, Agency § 400; 3 CJS 39, supra, § 161; *D'Acquisto v. Evola,* supra (202 P2d at 598). The testimony is to the effect that in Ray's history of dealing with Haas since 1917, there were very few times Ray was called upon to make up quality or quantity shortages, and none during the years 1950 and 1951.

Plaintiff cites *Simonds v. Wrightman,* 36 Or 120, 58 P 1100 (1899), as evidencing no change in the method of buying hops as testified to by Mr. Ray. To the contrary, we find in Simonds a striking change in the method employed in that case and the method followed by Ray. The transaction described in Simonds was held to be a sale between a vendor and vendee and very properly so. There, the local buyer, Neis Co., bought the hops at 7½¢ per pound and resold them to the eastern buyer Simonds for 9⅝¢ per pound. The Oregon buyer in that case took title and assumed the economic risk of resale. Here, Ray acquired no risk and took no title. What may have been the customary method in 1899 was clearly not the method

followed by Ray and Haas in 1950 and 1951. The Simonds case exemplifies the difference between a purchase made by an independent business man and the ultimate resale of his wares to another and a purchase made by an agent for his principal.

We hold that the relationship between Ray and Haas is so closely identified that the activities of Ray were the activities of Haas and that they functioned as principal and agent.

### Haas's Activities in Oregon Through the Agency of Ray as Doing Business in This State

■ We have yet to consider whether the transactions had by and between Haas and its agent, Ray, and those which followed in its disposition of the hops acquired through that agency constitute "doing business within this state."

We do not reach the basic question involved by simply holding that Ray was the agent of Haas in the purchase of the hops which it made for plaintiff. The more important matter is whether the transactions consummated by Haas through its agent, Ray, constituted "doing business within this state," so as to subject Haas to the payment of the excise tax stipulated by § 110-1506(a), OCLA. That section reads:

"Every mercantile, manufacturing and business corporation doing or authorized to do business within this state, * * * shall annually pay to this state, for the privilege of carrying on or doing of business by it within this state, an excise tax according to or measured by its net income, * * *."

"Doing business" is defined by § 110-1502(f), OCLA, to mean:

"The term 'doing business', as herein used, means any transaction or transactions in the course

of its actvities conducted within the state by a national banking association, by a corporation created under the laws of this state or by a foreign corporation."

The Commission's concept of the meaning of "doing business," and the one it applies to Haas's Oregon operations is reflected by its Regulations, Art 502-f (1951), reading:

"A taxpayer is doing business when it engages in any profit-seeking activity which it was created to perform, regardless of how limited in extent the activity may be. What transaction or transactions need be entered into within this state in the course of such an activity to constitute the doing or carrying on of business within this state is primarily a question of fact, depending upon the circumstances in each case, and a test of universal application cannot be stated. A taxpayer is clearly doing business within this state if it occupies, has, maintains or operates an office, shop, store, warehouse, factory, agency or other place within this state where some of its affairs are systematically and regularly carried on, notwithstanding the fact that it may also enter into transactions outside this state. Likewise, a corporation engaged in the sale of tangible personal property is doing business within this state if sales activities are regularly carried on within this state by an employe or agent of the seller as distinguished from an independent contractor, and if either a stock of goods is maintained within this state, or an office or other place of business where affairs of the corporation are regularly carried on is maintained within this state."

When it is found that a corporation is doing business in this state as above defined, then § 110-1507, OCLA, becomes applicable unless it can be said that in so doing it transgresses the requirements of due process imposed by the United States Constitution or

creates a type of taxation forbidden by the Commerce Clause.

In *Welch Holding Co. v. Galloway*, 161 Or 515, 89 P2d 559 (1939), the court gave attention to §§ 69-1306 and 69-1302, Oregon Code 1930, and later respectively codified as §§ 110-1506(a) and 110-1502(f), OCLA, in a determination of the meaning of "doing business" as used in those sections and concluded:

"* * * It seems that in their ordinary sense the words 'doing business' mean the engaging in activities in the pursuit of gain. * * *" (161 Or at 527)

Tested by that definition of "doing business," we must conclude that its transactions in Oregon with the help of Ray were "activities in the pursuit of gain," in addition to the operation of its Oregon hop farms.

The hop transactions consummated by Haas in Oregon with Ray as its agent during the years 1950 and 1951 were regular and systematic and, in the aggregate, a very considerable amount in terms of hops purchased and resold by Haas. We do not have before us poundage or prices paid, but reach that conclusion from an examination of miscellaneous documents found in the record. This has further support from the testimony of the president of Ray to the effect that in 1950 and 1951 the services of that corporation were devoted entirely to the interests of Haas.

In the terms of regulation 502-f, supra, formulated to further define by illustration the meaning of "doing business," as used in § 110-1502(f), OCLA, we find that Haas was engaged in a profit-seeking activity in purchasing and reselling Oregon hops with an agency in this state systematically carrying on some of its affairs, particularly in completing purchases of hops

in its behalf, warehousing for it the hops thus acquired and carrying out Haas's instructions to ship to its buyers hops which it had in storage in this state.

This conclusion finds support in the following cases where purchases were made by foreign corporations through an agent in a different state which resulted in findings that the corporations were "doing business" in the state where the agent made purchases in his principal's behalf. *State v. Pioneer Creamery Co.,* 211 Mo 116, 245 SW 361 (1922); *Meade Fibre Co. v. Varn,* 3 F2d 520 (4th Cir 1925); *McCarthy Sheep Co. v. S. Silberman & Sons,* 290 F 512 (DC Wyo 1923).

In *State v. Pioneer Creamery Co.,* supra, the defendant creamery company, an Illinois corporation, was charged with doing business in Missouri without first complying with the law of that state. The company had its principal office and creamery in Quincy, Illinois. It established a local agent in Madison, Missouri, to buy cream in its behalf and ship it thence to Quincy for conversion into creamery products at that point. In holding that the creamery was doing business in Missouri, the court observed:

"* * * The transaction was complete before interstate commerce began, and there was no element in the contract of purchase that the milk should be shipped to the defendant company in Illinois.

"As stated in Browning v. Waycross, 233 U.S. 17, 34 Sup. Ct. 580 (58 L. Ed. 828):

" 'It is manifest that if the right here asserted were recognized, or the power to accomplish by contract what is here claimed were to be upheld, all lines of demarcation between national and state authority would become obliterated,' etc." (245 SW at 363)

In *Meade Fibre Co. v. Varn,* supra, plaintiff was an Ohio corporation that employed one Johnson as its agent to purchase wood pulp from farmers in South. Carolina for delivery f.o.b. at some railroad station in that state consigned to the fibre company at Kingsport, Tennessee. The court relying upon *International Harvester Co. v. Kentucky,* 234 US 579, 583, 58 L ed 1479, 34 S Ct 944, held that the fibre company was doing business in South Carolina.

Agents of an Illinois corporation in the state of Wyoming buying wool and entering into contracts for the purchase of wool, for which they made payment by drafts drawn on the principal and shipping the wool out of state for principal were held to be "doing business" for S. Silberman & Sons in Wyoming. *McCarthy Sheep Co.,* supra, at 516.

In the following cases the element of warehousing products purchased in a state other than the principal place of business of a foreign corporation is held to be an element decisive of "doing business" in the state of the warehousing. *R. J. Reynolds Tobacco Co. v. Carson,* 187 Tenn 157, 213 SW2d 45 (1948); *Chassaniol v. Greenwood,* 291 US 584, 78 L ed 1004, 54 S Ct 541 (1934); and *W. W. Cargill Co. v. Minnesota et al.,* 180 US 452, 45 L ed 619, 21 S Ct 423 (1900); *Treasury of Indiana v. Wood Preserving Corp.,* 313 US 62, 85 L ed 1111, 61 S Ct 885.

In the R. J. Reynolds case, supra, the element of agency was not the persuasive factor. The factual situation was somewhat the reverse of what is present here in that the subject matter was a finished product of the plaintiff tobbacco company, but, nevertheless, involved the right to levy an excise tax, as here, as an incident to "doing business" in the state of Tennessee.

The Reynolds Co. shipped carloads of its products from out of state to public warehouses in Memphis and Nashville, where it was stored in public warehouses, from whence orders from customers in those cities were filled from time to time and shipped on orders from the out-of-state head office of that company. The Supreme Court of Tennessee in holding that such activity constituted doing business in that state observed (213 SW2d at p 49): "The storage in warehouses is not an 'interruption' [of interstate movement] but a 'cessation' of the shipment, and the goods are held in warehouses * * * not designated or separated for sale to any particular customer or customers, but subject to sale by the Complainant to any of its customers after the storage has been made." The factual situation with reference to Reynolds' storage and ultimate customer shipment in that case is identical to the warehousing and after shipment of the Haas hops in the case at bar which when warehoused were not committed to an interstate journey.

In coming to its conclusion in Reynolds, supra, the court was guided by similar doctrines enunciated in *General Oil Co. v. Crain,* 209 US 211, 52 L ed 754, 28 S Ct 475 (1908), and *Independent Warehouses, Inc. v. Scheele,* 331 US 70, 91 L ed 1346, 1358, 67 S Ct 1062 (1947).

We hold that Haas's purchasing and warehousing activities in this state constitute a "local incident" of no mean magnitude as that phrase is employed in the opinions of the U. S. Supreme Court and are alone sufficiently apart from interstate commerce to sustain the imposition of Oregon's privilege tax. They are typical local operations of a foreign corporation whether engaged in selling or purchasing merchandise.

*Does the Imposition of an Excise Tax on Haas's
Net Income Contravene the Commerce or
Due Process Clauses of the Federal
Constitution?*

This is the broad issue presented by this appeal.

"One who attacks a formula of apportionment carries a distinct burden of showing by 'clear and cogent evidence' that it results in extra-territorial values being taxed." *Butler Bros. v. McColgan,* supra (86 L ed at 996).

Plaintiff frames the question as "* * * not whether plaintiff is doing business in Oregon—admittedly it is—but whether it is doing business in Oregon insofar as its *purchases of hops from Ray* is concerned so as to subject all income from its dealer operations earned in the United States to the Oregon allocation formula." (Emphasis supplied.) In so saying it will be observed that Haas predicates the foregoing statement upon doing business in Oregon "insofar as its purchases of hops from Ray is concerned." Our earlier conclusion that the Ray-Haas relationship was not one of vendor and vendee, but of principal and agent, removes that element from further consideration.

But the heart of plaintiff's resistance to the Commission's calculation of net income by the apportionment method rather than the segregated method is plaintiff's characterization of its operations in Oregon as "two clearly distinct businesses." Plaintiff concedes that it is subject to the corporation excise tax for its hop farming activities carried on in Oregon, but vigorously maintains that any hop purchasing activity it was engaged in is a separate and distinct business.

Plaintiff argues that even when a formula of apportionment is applied by a state, it must not reach profits which are in no sense attributable to transactions beyond its jurisdiction and in support of this premise cites *Hans Rees' Sons v. North Carolina,* 283 US 123, 75 L ed 879, 51 S Ct 385 (1931). We think Hans Rees' Sons does not stand as authority for what plaintiff claims for it. Hans Rees' Sons concerned the use of a single apportionment factor, i.e., real and personal property (see 75 L ed at 879), which was found to be unreasonably and arbitrarily applied. The court refused to approve the tax result reached under the North Carolina statute. It did not, however, rest its holding upon the ground that an income formula could not be used as to a foreign corporation engaged in a multistate business. To the contrary, it struck it down on the ground that in that case the particular formula employed consisted solely of the property factor which did not give proper consideration to the corporation's extensive activities without the state and, therefore, produced an unreasonable result. See the discussion of Hans Rees' Sons to the same effect in Altman and Keesling, Allocation of Income in State Taxation (2d ed 1950), at p 100, and where the authors observe:

> "* * * If other factors had been used, such as payroll and sales, which would have given weight to the extensive out-of-the-state activities, the formula would unquestionably have been upheld."

In *Butler Bros. v. McColgan,* supra (86 L ed at 995), wherein the Hans Rees' Sons case is considered and treated as inapplicable, the court gives approval to a three-factor formula like that of Oregon, and which was employed by the state of California in the computation of a privilege tax also similar to Oregon's.

We are unable to discover any case wherein a three-factor formula has been disapproved as a measure of taxation when tax jurisdiction is present. See, also, *Hines Lumber Co. v. State Tax Commission*, 215 Or 453, 456, 336 P2d 75 (1959).

A very recent and important pronouncement on the question of state taxation of interstate commerce was made by the Supreme Court in *Northwestern States Portland Cement Co. v. Minnesota* and its companion case, *Williams v. Stockham Valves & Fittings, Inc.* (disposed of in the same decision), 358 US 450, 3 L ed 2d 421, 79 S Ct 357. Here, we find answer to plaintiff's contentions concerning the alleged contravention of the Due Process Clause. At page 431, 3 L ed 2d, the court says:

> "Nor will the argument that the exactions contravene the Due Process Clause bear scrutiny. The taxes imposed are levied only on that portion of the taxpayer's net income which arises from its activities within the taxing State. These activities form a sufficient 'nexus between such a tax and transactions within a state for which the tax is an exaction.' Wisconsin v. J. C. Penney Co., supra (311 US at 445). It strains reality to say, in terms of our decisions, that each of the corporations here was not sufficiently involved in local events to forge 'some definite link, some minimum connection' sufficient to satisfy due process requirements. Miller Bros. v. Maryland, 347 US 340, 344, 345, 98 L ed 744, 748, 74 S Ct 535 (1954). See also Ott v. Mississippi Valley Barge Line Co., 336 US 169, 93 L ed 585, 69 S Ct 432 (1949); International Shoe Co. v. Washington, 326 US 310, 90 L ed 95, 66 S Ct 154, 161 ALR 1057 (1945); and West Pub. Co. v. Mc-Colgan, 328 US 823, 90 L ed 1603, 66 S Ct 1378, supra. The record is without conflict that both corporations engage in substantial income-producing activity in the taxing States.   *   *   *   As was

said in *Wisconsin v. J. C. Penney Co.,* 311 US 435, 85 L ed 267, 61 S Ct 246, 130 ALR 1229, supra, the 'controlling question is whether the state has given anything for which it can ask return.' Since by 'the practical operation of [the] tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred   *   *  ·  *' it 'is free to pursue its own fiscal policies, unembarrassed by the Constitution   *   *   *.' "

See, also, *Memphis Natural Gas Co. v. Stone,* 335 US 80, 92 L ed 1832, 1839, 68 S Ct 1425 (1948); *Butler Bros. v. McColgan,* supra (86 L ed at 996).

Another ground urged by Haas in its objection to taxation based on an apportionment formula is that taxation by the state of Oregon on the sales of hops which it purchased in Oregon will subject it to the possibility of multiple taxation, in that other states may also tax these sales in interstate commerce. Plaintiff claims this is forbidden by the Commerce Clause.

The Commission urges that the commerce clause of the federal Constitution is not violated by the imposition of the Oregon corporation excise tax in the manner proposed by the Commission because the hop purchasing activity of plaintiff in Oregon is a local activity that precedes and is not a part of interstate commerce. The Commission also maintains that its excise tax on plaintiff's apportioned Oregon income will not be subject to taxation by other states and, therefore, will not result in the risk of multiple taxation. The Commission also submits that plaintiff's hop purchasing activity in and of itself is sufficient to subject plaintiff to the apportionment method of net income calculation. We will later give attention to these respective contentions.

In the case at bar Haas's business is selling hops

on a multistate and foreign basis. As far as the state of Oregon is concerned, and as we have seen, plaintiff produces some of these hops on the hop farms operated by it, and also purchases some of its hop requirements from individual Oregon hop growers through the agency of Ray. Whatever may be said of Haas's hop *purchasing* activities, it appears that the nature of plaintiff's business is such that the hop *producing* activities on its Oregon hop farms have as the ultimate purpose of this production the selling of hops in multistate and foreign markets and that its purchasing and producing activities are interrelated and do benefit each other. Therefore, any determination of the income from each activity considered separately and apart from the other activity would not properly reflect the value of all plaintiff's activities considered as a whole in an organized business operation.

■ The Oregon corporation excise tax requires that business corporations "doing or authorized to do business within this state" shall pay an excise tax for the privilege of carrying on or doing business in Oregon and this tax shall be measured by the net income of the taxpaying corporation. It is not a tax on net income, but rather is a tax on the privilege of doing business resting upon a determination of the income which plaintiff earned solely within this state. *Hines Lumber Co. v. State Tax Commission,* supra (215 Or at 469).

■ When we consider Haas's Oregon activities as a part of an integrated whole, i.e., as a unitary business operation rather than as separate and unrelated business activities, the constitutionality of the tax calculated on apportioned share of plaintiff's total income is restricted to questions relating to the Commerce

Clause. The due process issue argued by plaintiff disappears because the tax on apportioned income does not have to be grounded solely on plaintiff's hop purchasing activity in Oregon.

In an excellent article by Professor Hartman, entitled State Taxation of Interstate Commerce: A Survey and an Appraisal, 46 Va L Rev 1051, 1058 (1960), the Due Process Clause is discussed as a possible limitation on the power of a state to tax a multistate operation:

"* * * Briefly the purpose of that clause [the commerce clause limitation] is given in the language of the present Court:

" '* * * The recurring problem is to resolve a conflict between the Constitution's mandate that trade between the states be permitted to flow freely without unnecessary obstruction from any source, and the state's rightful desire to require that interstate business bear its proper share of the costs of local government in return for benefits received [citing Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U.S. 157, 166 (1954).].'

The restraining power of the due process clause, it might be said, keeps the taxing power at home. It prevents a state from fixing its tax talons on extra-territorial values. The absence of any sufficient 'nexus' or connection in fact between the taxed business and the taxing state would be enough in itself for upsetting a tax on due process grounds. The term 'nexus' has become an indispensible part of the tax vocabulary, when reference is to the requisites of the due process clause as applied to state and local taxation of multistate operations. Consistent with these nexus requirements a state can exert its taxing power only 'in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred

\* \* \*.' [citing Wisconsin v. J. C. Penney Co., 311 U.S. 435, 444 (1940).]."

By treating plaintiff's business operations as unitary, the hop farming and local hop purchases and later warehousing supply the "nexus" upon which the due process aspects of the Oregon corporation excise tax can be satisfied.

■ The conclusion of Professor Hartman, in which we concur, restricts inquiry to whether the Commerce Clause prohibits the tax on plaintiff's apportioned income. By apportioning plaintiff's total net income from all its multistate operations it is clear that at least part of the net income so apportioned resulted from interstate commerce. The question then is whether this results in a permissible or forbidden taxation of interstate commerce.

The *Northwestern States Portland Cement Co.* case, supra, involved a Minnesota statute and its companion, *Stockham Valves,* supra, a Georgia statute, both of which levied taxes (as income but not as privilege taxes) on that portion of a foreign corporation's net income earned from and fairly apportioned to business activities within the taxing state when the corporate activities were *exclusively* in the furtherance of interstate commerce.

The Northwestern decision holds "that net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same." (3 L ed 2d at 424) The court also observed: "While it is true that a State may not erect a wall around its borders pre-

venting commerce an entry, it is axiomatic that the founders did not intend to immunize such commerce from carrying its fair share of the costs of the state government in return for the benefits it derives from within the State." (3 L ed 2d at 429)

The significance of Northwestern to the case at bar is that the court approved the rationale of *Spector Motor Service, Inc. v. O'Connor,* 340 US 602, 95 L ed 573, 71 S Ct 508. The Oregon corporate excise tax is like that of the state of Connecticut which was stricken down in Spector in that the tax imposed here is a privilege tax measured by net income. However, and unlike the Oregon tax, as applied to Haas in this matter, in Connecticut it was imposed upon Spector's income derived exclusively from interstate commerce (95 L ed at 575), it having no intrastate business in Connecticut.[1] The conclusion in Spector was grounded upon the theory that there was no incidence of "local activity" in Connecticut and, therefore, no nexus whereby that state could either grant or deny Spector the right to engage in interstate commerce in that state. See *Oregon-Nevada-California Fast Freight, Inc. v. Tax Commission,* 223 Or 314, 353 P2d 541, appeal dismissed sub nom *Oregon-Nevada-California Fast Freight, Inc. v. Stewart,* 5 L ed 2d 363, 81 S Ct 357 (1961).

But the holding in the Spector case does not mean

[1] Mr. Justice Clark, author of the opinion in the Northwestern case, entered a vigorous dissent in Spector in which he was joined by two of his associates and wherein he makes the following observation:

"The Court assumes, and I think it has been clearly demonstrated, that the tax under challenge is nondiscriminatory, fairly apportioned and not an undue burden on interstate commerce. Hence, if appellant had been engaged in an iota of activity which the court would be willing to call 'intrastate,' Connecticut could have applied its tax to the company's interstate business in the precise form which it now seeks to employ—a tax on the privilege of doing business in Connecticut measured by the entire net income attributable to the State, even though derived from interstate commerce.

"But solely because Spector engages in what the Court calls 'exclusively interstate' business, a different standard is applied. * * *"

that application of the Oregon excise tax to plaintiff's net income when determined by the apportionment method will result in a fatal levy on Haas's privilege to engage in interstate commerce. This is also the conclusion of Professor Hartman, who indicates why this is so in his article, entitled State Taxation of Corporate Income from a Multistate Business, 13 Van L Rev 21, 40 (1959):

"The method of collecting the tax also becomes important where a privilege tax is levied on a business consisting of both interstate commerce and local business. A tax may validly be imposed for the privilege of engaging in the local aspects of the business, even inseparably connected with the interstate business, if the tax is not demanded as a condition of doing *any* business in the taxing state [citing Southern Natural Gas Co. v. Alabama, 301 U.S. 148 (1937); Pacific Tel. & Tel. Co. v. Tax Comm'n, 297 U.S. 403 (1936); Southern Ry v. Watts & Watts, 260 U.S. 519 (1923)]. Unless collection of a privilege tax is left to the ordinary means of collection by a money judgment in a suit at law, rather than eviction for nonpayment, where both interstate and intrastate commerce are inseparably connected, it would seem to be open to the objection that it is made a prohibited condition or continuing to do interstate business [citing Pacific Tel. & Tel. Co. v. Tax Comm'n, 297 U.S. 403, 414 (1936); Underwood Typewriter Co. v. Chamberlain, 354 U.S. 113, 119-20 (1920); St. Louis, S. W. Ry v. Arkansas, 235 U. S. 350, 368 (1914)]."

The foregoing conclusion of Professor Hartman gathers support from the Northwestern decision, where the court indicated the method of collection was important, saying: "The States are left to collect only through ordinary means. The tax, therefore, is 'not open to the objection that it compels the company to

pay for the privilege of engaging in interstate commerce.'" (3 L ed 2d at 429)

In *Oregon-Nevada-California Fast Freight, Inc. v. Tax Commission,* supra, plaintiff sought a refund of Oregon excise taxes and wherein it advanced the same constitutional contentions respecting the Commerce Clause raised by Haas in the case at bar. The only essential difference between that case and this being the apportioning formula employed. Here, as we have noticed, the plaintiff does not challenge the formula, but only the right to apply it. In that case Mr. Justice SLOAN made a careful and persuasive analysis of the Spector and Northwestern cases and held that Spector was not authority for prohibiting application of Oregon's corporation excise tax to an apportioned share of a motor carrier's net income calculated from a formula which included *both intrastate and interstate* business in Oregon. An appeal to the United States Supreme Court was dismissed for want of a substantial federal question. *Oregon-Nevada-California Fast Freight, Inc. v. Tax Commission,* supra (5 L ed 2d 363). The inclusion in the formula there employed of income which was in part derived from interstate commerce was not construed as a forbidden tax on the privilege of engaging in interstate commerce.

Haas, as we earlier observed, urges the possibility of its interstate commerce being subjected to the burdens of multiple state taxation if the Oregon tax is upheld. We find in the Northwestern case a convincing reason why the doctrine of multiple or cumulative burdens on interstate commerce does not apply here:

"* * * This is not an unapportioned tax which by its very nature makes interstate commerce bear more than its fair share. * * * 'it is interstate commerce which the State is seeking to reach

and * * * the real question [is] whether what the State is exacting is a constitutionally fair demand by the State for that aspect of the interstate commerce to which the State bears a special relation.' The apportioned tax is designed to meet this very requirement and 'to prevent the levying of such taxes as will discriminate against or prohibit the interstate activities or will place the interstate commerce at a disadvantage relative to local commerce.' [Central Greyhound Lines v. Mealey, 334 US 653, 670, 92 L ed 1633, 68 S Ct 1260 (1948).] Logically it is impossible, when the tax is fairly apportioned, to have the same income taxed twice. * * *" (3 L ed 2d at 429)

We conclude the Commerce Clause does not prevent the application of the Oregon excise tax to plaintiff's net income calculated, as done by the Commission, by the apportionment method. The tax would not be one imposed on the privilege of engaging in interstate commerce, but rather one imposed on the clearly local hop activities. The corporation excise tax is not levied as a condition precedent to plaintiff's engaging in interstate commerce from Oregon. Plaintiff employs income-producing factors in Oregon and part at least of this income is realized in interstate channels. The apportionment formula required by the Commission determines the part of this income attributable to Oregon. The Commission's decision to calculate plaintiff's net income by the apportionment method can be sustained on the basis plaintiff is conducting a unitary business operation in Oregon, the value of which entails both local and interstate activities. See Altman & Keesling, Allocation of Income in State Taxation, supra.

The judgment of the circuit court is reversed.