## ASH GROVE CEMENT COMPANY
### *v.*
### DEPARTMENT OF REVENUE

Joseph M. Wetzel, Black, Helterline, Beck & Rappleyea, Portland, represented plaintiff.

Ira W. Jones, Senior Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered January 19, 1977.

CARLISLE B. ROBERTS, Judge.

Plaintiff is a Delaware corporation with headquarters in Kansas City, Missouri, engaged in business in the State of Oregon and subject to ORS chapter 317, the Corporation Excise Tax Law of 1929. This act imposes a tax upon the privilege of carrying on or doing business in this state. The tax is measured by the plaintiff's net income attributable to business activity in Oregon (ORS 317.070(1)), as determined by the provisions of the Uniform Division of Income for Tax Purposes Act, ORS 314.605-314.670. The uniform act provides for allocation of a multistate corporation's income when it does business in this state and it specifically prescribes formulas for use in apportioning business income earned in operations involving more than one state, including Oregon. Such formulas seek a rough justice which, unfortunately, is often the best standard that can be achieved in taxation. *Norfolk & W. R. Co. v. North Carolina,* 297 US 682, 56 S Ct 625, 80 L Ed 977 (1936).

■ ORS 314.670 takes cognizance of the possibility of a failure of the generally applicable formulas fairly to represent the Oregon business activity and it permits the use of a special formula or method in a particular instance, including the use of separate accounting for the Oregon business activity.

The issue presented can be paraphrased by a quotation taken from *Butler Bros. v. McColgan,* 17 Cal2d 664, 667-668, 111 P2d 334, 336 (1941):

"The sole question to be determined on this appeal is whether it is lawful and proper for the respondent, as franchise tax commissioner, to insist upon use of the formula for allocation of income in a case such as this, or whether the company is entitled to use the separate accounting of its San Francisco house to determine its net income in the state of California. The answer to this

[ 7 ]

question depends entirely on the nature of the business conducted within and without the state by appellant, a foreign corporation. It is only if its business within this state is truly separate and distinct from its business without this state, so that the segregation of income may be made clearly and accurately, that the separate accounting method may properly be used. Where, however, interstate operations are carried on and that portion of the corporation's business done within the state cannot be clearly segregated from that done outside the state, the unit rule of assessment is employed as a device for allocating to the state for taxation its fair share of the taxable values of the taxpayer. (Citations omitted.) * * *"

Plaintiff appealed to the defendant, seeking to report its Oregon income on a separate accounting basis for the calendar years 1966, 1967, and 1969 through 1973. The defendant's Order No. I 76-7, dated March 5, 1976, denied the plaintiff's request and sustained the income tax auditor's requirement that the plaintiff corporation report its total business activity on the unitary method of computation, utilizing the three-factor formula for apportionment specified in ORS 314.650. Plaintiff paid its taxes as required by this method but appealed to this court from the defendant's order, seeking a reversal of the denial of separate accounting of most of its Oregon business activity for the tax years 1969 to 1973, inclusive, and for a refund of taxes the corporation deemed overpaid by the requirement to report on the unitary basis. (The tax years 1966 and 1967, in issue at the departmental hearing, were not pleaded in this court.)

In cases such as this, involving the question of segregated versus unitary accounting, it has often been observed that "the facts are all important." *Norfolk & Western R. Co. v. Missouri Tax Com.,* 390 US 317, 88 S Ct 995, 19 L Ed2d 1201 (1968); *Hines Lumber Co. v. Galloway,* 175 Or 524, 539, 154 P2d 539, 544 (1944); *Hamilton Management Corp. v. Com.,* 3 OTR 154, 156 (1968).

The plaintiff's first predecessor in interest began as a Missouri corporation in 1882, manufacturing and selling lime products. Many years later, a cement business was developed. The parties have stipulated, *inter alia*:

"7. During the period 1969-1973 Ash Grove's principal business was the manufacture and sale of cement. About 85% of its gross receipts each year related to cement sales.

"8. Ash Grove also has two lime manufacturing plants within its corporate structure: one in Springfield, Missouri and one in Portland, Oregon.

"9. The Springfield plant began operations at the turn of the twentieth century. Its manufacturing facility is in Springfield and the sales from that plant are made in Missouri, Kansas, Nebraska, Iowa, South Dakota, North Dakota, Minnesota, Arkansas, Oklahoma, Colorado and Texas. A few sales are also made each year in Illinois, Ohio and New Jersey.

"10. Over the years some lime products from the Springfield plant were shipped into Oregon, Washington, California and British Columbia (hereinafter referred to collectively as the 'Northwest Territory'). However, it was recognized that there was a potentially large market for lime in the Northwest Territory. The wood processing industry and the road building process were two areas that looked particularly good as potential users of lime. Accordingly, a 4.5 million dollar lime plant was constructed at Portland, Oregon and was put into operation in 1964.

"11. Lime manufactured in the Portland plant is sold exclusively to customers in Oregon, Washington, California and British Columbia (the 'Northwest Territory').

"12. The following annual amounts of lime have been sold from the Portland plant in the Northwest Territory (by years and tons sold): 1965, 46,286; 1966, 55,807; 1967, 43,680; 1968, 51,191; 1969, 48,766; 1970, 47,775; 1971, 49,450; 1972, 51,223; 1973, 60,907; 1974, 65,604.

"13. During the period 1969-1973 Ash Grove continued to supply customers in the Northwest Territory from its Springfield plant with lime products that the

[ 9 ]

Portland plant did not make, namely, pulverized quick lime and slik lime. Sales of these two types of lime were made to Ocean Cement Ltd. and Dealers Supply Company, neither of which purchases products from the Portland plant.

"14. The following annual amounts of pulverized quick lime and slik lime from the Springfield plant were sold in the Northwest Territory (by years and tons sold): 1965, 5,877; 1966, 5,037; 1967, 4,605; 1968, 4,452; 1969, 3,670; 1970, 2,362; 1971, 1,926; 1972, 1,490; 1973, 891; 1974, 648.

"15. Ash Grove has always been reluctant to continue these lime sales in the Northwest Territory from the Springfield plant. Shipping costs make the profit margin thin, and the same lime can be more profitably sold in its regular Midwest Territory. However, the Northwest customers for this type of lime are unable to secure the same quality and type of lime elsewhere, so the sales continue but in a steadily diminishing volume.

"16. Sales from the Springfield [Missouri] plant (in dollars) can be analyzed as follows:

| Year | Northwest Sales | Other Sales | Total Sales |
|------|-----------------|-------------|-------------|
| 1965 | $129,088 | $1,644,224 | $1,773,312 |
| 1966 | 121,465 | 1,714,180 | 1,835,645 |
| 1967 | 116,844 | 1,727,497 | 1,844,341 |
| 1968 | 112,573 | 1,951,910 | 2,064,483 |
| 1969 | 101,766 | 2,016,005 | 2,117,771 |
| 1970 | 63,091 | 2,340,278 | 2,403,369 |
| 1971 | 52,035 | 2,141,570 | 2,193,605 |
| 1972 | 45,355 | 2,086,729 | 2,132,084 |
| 1973 | 27,899 | 2,575,916 | 2,603,815 |
| 1974 | 32,570 | 3,238,527 | 3,271,097 |

"17. During 1969-1973 Ash Grove also sold small amounts of hydrate lime to Dealers Supply Company in retail size 10-pound bags from its Springfield plant. During that period the Portland plant did not have the facilities to pack and ship retail size 10-pound bags of hydrate lime.

"18. Ash Grove makes no cement sales in the Northwest Territory. None of the customers to which it sells cement (all in the Midwest) is a customer of Ash Grove's Portland lime plant."

The testimony shows, and the court finds, that the plaintiff's midwestern cement plants in Louisville, Nebraska, and Chanute, Kansas, its lime plant in Springfield, Missouri, and its headquarters in Kansas City, Missouri, constitute the operating and administrative activities of a typical multistate corporation which is properly required to make its income tax reports to a number of states under provisions for allocation and apportionment similar to those set out in the Uniform Division of Income for Tax Purposes Act (ORS 314.605 to 314.670). The parties agree that, as to that part of the business, various factors are so intertwined that it is not feasible to determine the source of net income between several states except through the use of an approved formula. (This includes sales from the Midwest to the "Northwest Territory," including Oregon, although these are very small from Oregon's standpoint.)

However, the record shows that the situation is quite different with respect to the lime plant in Portland, Oregon. It is physically removed from the midwestern complex (1,800 miles). Freight charges enhance the separation. (It is uneconomical for the several plants in the Midwest to interchange raw materials or finished products with the Portland plant.)

Although several of the Kansas City officers regularly visit and consult with the Portland management, the autonomy of the latter is very substantial. (The court recognizes that the power is in Kansas City and changes could be made at any time.) Portland does its own basic accounting, hires and discharges personnel as needed, has its own local law firm to advise it, makes its own purchases (except paper bags), and has its own sales department. The costs of the few services rendered to the Portland plant by the Kansas City headquarters and its staff are easily separable and chargeably (but actually were not charged to Portland in the years considered in this case).

[ 11 ]

The strongest link by way of services between Kansas City and Portland was the former's provision of accounting aids through use of the Kansas City computer. (This not only aided Portland mechanically but gave the top management important data essential to overall supervision.) But separability of activities was still maintained during the computer use and no charge was made to Portland for it. Income attributable to Oregon was not affected.

The most important aspect of this suit is that plaintiff was able to demonstrate to the court's satisfaction that the Oregon activities during the years in question gave rise to an income tax net loss. There was no income with which to measure the tax.[1] *See Utah Const. & Mining v. Tax Com.,* 255 Or 228, 465 P2d 712 (1970), and *John I. Haas, Inc. v. Tax Com.,* 227 Or 170, 192, 361 P2d 820, 830 (1961).

It appears to the court that the defendant has based its position upon the following proposition: (1) the plaintiff, a foreign corporation, was doing business in Oregon during the years in question; (2) the plaintiff is a unitary corporation; and (3) ergo, even though plaintiff suffers losses in its business transacted in Oregon but has an overall net income after deducting losses from the Portland operation (and possibly elsewhere), allocation and apportionment of the income must follow and the amounts demanded by the state have been properly paid to Oregon in reliance upon the statutory allocation formula found in ORS 314.650-314.665. The word "unitary" expresses a conclusion which requires careful examination.

■■ The necessity and justification for the use of allocation formulas for determination of corporate income attributable to a particular state are found in

---

[1] In its published rule, OAR 150-314.615-(D), defendant has stated: "* * * Whether the Oregon activities engaged in for a financial profit actually result in a financial profit *or loss* is not determinative. * * *" (Emphasis supplied.) This is a correct statement in context, but must be used with caution unless the facts unquestionably require apportionment and allocation.

the typical factual situations; *e.g.,* to attribute to the state the aliquot corporate profits earned through steps in a vertical process, a series of transactions which may begin upon obtaining raw materials in one or more states, to be turned to manufactured goods in another state and ending with sales in several other states, from which the ultimate gain is derived by the taxpayer. *Underwood Typewriter Co. v. Chamberlain,* 254 US 113, 41 S Ct 45, 65 L Ed 165, 3 AFTR 3087 (1920). Another example is that of a multistate corporation which obtains unusually favorable inventory prices through very large purchases, made by a central buying division, and then places its goods in numerous outlets in several states. With such large purchases, markdowns in prices may be necessary to dispose of residues and some outlets may show a bookkeeping loss. The corporation, nevertheless, may be denied separate tax reporting of an alleged loss, indicated by its separate accounting, if it fails to prove by clear and cogent evidence that extraterritorial values have been taxed. *Butler Brothers v. McColgan,* 315 US 501, 62 S Ct 701, 86 L Ed 991 (1942). As stated in Hellerstein, *Recent Developments in State Tax Apportionment and the Circumscription of Unitary Business,* XXI Nat'l Tax J (No. 4, December 1968), at 500, it is improper to disregard

> "* * * the underlying reasons for the development of formulary apportionment, namely, that there is no viable way of separately accounting for the profits of a business where interdependent operating functions that produce the profits of the enterprise are carried on in more than one state. Thus, to take a simple case, where goods are manufactured in State A and sold in State B, efforts to account separately for the profit from these interdependent operations have floundered on the inability to find acceptable methods of breaking up the profit realized into a 'manufacturing' profit and a 'selling' profit. * * *"

Lacking the clear evidence which was presented in this suit, and conscious that several states can justly claim that activities protected by them were essential

to the final realization of income, experience has shown that an acceptable allocation formula must be used in most situations.

This court has not had the use of the record in the *Butler Brothers* case. However, Mr. Justice Douglas emphasized in his decision the benefits to the taxpayer accruing from its central control, management, advertising and the like, and stressed:

"* * * Admittedly, centralized purchasing results in more favorable prices being obtained than if the purchases were separately made for the account of any one branch. What the savings were and what portion is fairly attributable to the volume contributed by the San Francisco branch do not appear. * * * There is no justification on this record for singling out the San Francisco branch rather than another and concluding that it made no contribution to those savings. * * *" (315 US at 508, 62 S Ct at 705, 86 L Ed at 996-997.)

■ It must be constantly held in mind that Oregon seeks to measure its tax only upon net income attributable to Oregon. ORS 317.070(1). If no corporate profit can be found which can be attributed to Oregon, then only the minimum tax of $10 can be imposed upon a corporation over which the state has some jurisdiction. ORS 317.090; *Hines Lumber Co. v. Galloway, supra.*

Butler Brothers failed to meet its burden of proof. That is not the situation in the present suit. The separability of the Oregon lime plant from the midwestern parent complex has been well demonstrated. The exclusion from the balance sheet of any charges for the corporation's contribution of services to the Portland plant (which were shown to be inconsiderable, if not de minimis) makes possible a bona fide separate accounting in this instance. The record is replete with uncontradicted testimony that the Portland plant contributed nothing to the parent. The Portland plant operated at a loss throughout 1969-1973. After the initial capital investment, Kansas City and the midwestern manufacturing complex, during the years in question, contributed minimal services of central advertising and bag purchasing which, if charged to the Portland plant, would merely have enlarged its loss. (The Portland plant was able to operate

independently because its depreciation reserves gave it a cash flow.)

The defendant's administrative rule, published as OAR 150-314.615-(E), reflects *Hamilton Corp. v. Tax Com.,* 253 Or 602, 457 P2d 486 (1969), and takes cognizance that:

> "[a] taxpayer may have more than one 'trade or business.' In such cases, it is necessary to determine the business income attributable to each separate trade or business. The income of each business is then apportioned by an apportionment formula which takes into consideration the instate and outstate factors which relate to the trade or business the income of which is being apportioned."

The ruling then sets out indicia of a single trade or business, all of which were adverted to in the testimony and have been considered by this court in this suit.

The first indicator is captioned: "same type of business." This is applicable here (considering the Missouri lime plant and the Portland lime plant), but is overcome by geographical location, source and ownership of supply (third-party owned British Columbia lime for Portland, plaintiff's own Springfield lime deposits for Springfield), different customers, and the like. The very small percentage of Portland's business in relation to plaintiff's total business and the small percentage of plaintiff's lime business done by Portland aids segregation in accounting, also.

The second indicator listed by OAR 150-314.615-(E) is described as "steps in a vertical process" and is not applicable here.

The third is "strong centralized management." As stated above, the facts could change in any year, but during 1969 to 1973, inclusive, management provided little in services that the Portland plant could not have acquired from third persons at a reasonable fee, readily determined.[2]

---

[2]Plaintiff is most vulnerable here because of the importance in this context of centralized management. However, plaintiff can only be taxed the statutory minimum in Oregon for 1969 to 1973 because it has demonstrated that it has no income by which a tax could be measured.

This factual situation is readily distinguishable from that in *Coca Cola Co. v. Dept. of Rev.,* 5 OTR 405 (1974), *aff'd,* 271 Or 517, 533 P2d 788 (1975), involving the use of a syrup, based on a secret formula, absolutely controlled by the parent organization, coupled with the parent's active, extensive control and supervision of quality of product, advertising, method of marketing, research and development, maintenance and audit of books and records, as well as the geographical area to be served (which was not solely on the basis of freight rates). The factors of contribution and dependency were plain, and the Oregon business, even under its separate accounting, made a profit.

■ It is true that experience has shown that allocation and apportionment formulas must be used with much greater frequency than separate accounting. Segregated accounting may be "unusual." Hence, apportionment of income (unitary reporting) is deemed, prima facie, as the method for income tax accounting of multistate corporations, under present law. *Donald M. Drake Co. v. Dept. of Rev.,* 263 Or 26, 31, 500 P2d 1041, 1043 (1972), *aff'g* 4 OTR 552 (1971). Courts recognize that accounting can be arbitrary, that the business done within this state can be "managed," and that it is often impossible to unravel the accounts of a profitable interstate business. However, ORS 314.670 is applicable to the facts presented by Ash Grove. That statute provides:

"If the allocation and apportionment provisions of ORS 314.610 to 314.665 do not fairly represent the extent of the taxpayer's business activity in this state [as a basis for taxation], the taxpayer may petition for and the department may permit, or the department may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

"(1) *Separate accounting*;

"(2) The exclusion of any one or more of the factors;

"(3) The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

[ 16 ]

"(4) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income." (Emphasis supplied.)

On the basis of the record herein, this court is convinced that the tax assessed by the state in this instance would have to be paid from income properly attributable to other states. *See Wah Chang Corp. v. Commission,* 2 OTR 31 (1964).

The court finds that the plaintiff's Portland lime plant, in 1969 to 1973, inclusive, should be treated as a separate business of the plaintiff.

In the light of the foregoing decision, the plaintiff's second cause of suit, based upon the Commerce Clause and Due Process Clause of the U. S. Constitution, is moot.

Since the assessment exceeds the defendant's statutory authority, its order No. I 76-7, denying plaintiff's petitions for separate accounting and claims for refund for the tax years 1969, 1970, 1971, 1972 and 1973 shall be set aside and held for naught. The plaintiff is entitled to and should utilize separate accounting for corporation excise tax purposes for those years. Defendant shall assess taxes for the years in question at the statutory amount of $10 per year and refund overpayments of tax with interest pursuant to ORS 314.415.[3] Plaintiff is awarded its statutory court costs and disbursements.

---

[3]The testimony indicates that Ash Grove's Oregon plant began to enjoy profits in 1974 and 1975 and, presumably, thereafter. If other facts remain unchanged, it can be argued that the Portland operation should continue to file a separate return in future years, with apportionment between the several states in the "Northwest Territory." However, under the decision of this case and the authorities on which it is based, there is implicit recognition that each tax year must be considered on its own set of facts, with the presumption that the apportionment accounting of the total corporation is the preferred method of reporting unless the taxpayer proves otherwise.